453 So.2d 1121 (1984)
AC ASSOCIATES, a Partnership, Appellant,
v.
FIRST NATIONAL BANK OF FLORIDA, Frank V. Guinta, John Greco, Mac A. Greco, Jr., As Co-Personal Representative of the Estate of Mac A. Greco, Sr., and Annie B. Greco, As Personal Representative of the Estate of Joseph Greco, Appellees.
Frank GUINTA, John Greco, Mac A. Greco, Jr., Josephine Greco and Eugene S. Greco, As Co-Personal Representatives of the Estate of Mac A. Greco, Sr., et al., Appellants,
v.
M-W PROPERTIES CORPORATION, a Delaware Corporation, Appellee.
Nos. 82-52, 83-118 and 83-119.
District Court of Appeal of Florida, Second District.
May 25, 1984.
Rehearing Denied August 17, 1984.
*1123 Stevan T. Northcutt of Levine, Freedman, Hirsch & Levinson, P.A., Tampa, for appellant AC Associates.
David T. Knight and Jeanne M. Trudeau of Shackleford, Farrior Stallings & Evans, P.A., Tampa, for appellants Frank Guinta, Mac A. Greco, Jr., Josephine Greco and Eugene S. Greco, as co-personal representatives of the Estate of Mac A. Greco, Sr., et al.
Michael L. Kinney, Tampa, for appellant John Greco.
Bennie Lazzara, Jr., Tampa, for appellee Eugene S. Greco as co-personal representative of the Estate of Mac A. Greco, Sr., and Annie B. Greco as personal representative of the Estate of Joseph Greco.
David T. Knight and Jeanne M. Trudeau of Shackleford, Farrior, Stallings & Evans, P.A., Tampa, for appellee Frank V. Guinta; Frank Ragano, Tampa, for appellee John Greco.
Stevan T. Northcutt of Levine, Freedman, Hirsch & Levinson, P.A., Tampa, for appellee M-W Properties Corp.
LEHAN, Judge.
This consolidated appeal involves two cases testing, on allegations of changed circumstances, the continued validity of a parking agreement reciprocally affecting two adjacent parcels of real property. The validity of the agreement is challenged in one case by the holder of contractual rights to purchase one of the parcels and in the other case by the legal title holder of that parcel. The continued validity of that agreement is urged in both cases by owners of the other parcel.
In appeal number 82-52, brought by the holder of contractual rights to purchase one of the parcels, the trial judge declined *1124 to cancel or modify the agreement. In appeals numbered 83-118 and 83-119 (which are both from the same case and which are hereinafter referred to as "the second case"), brought by the legal title holder of the parcel which the plaintiff in case number 82-52 contracted to purchase, another trial judge modified the agreement to reduce its burden on the parcel. The trial judge in the second case, in the alternative, held that, if a court of appeal decides the judge lacked authority to so modify the agreement, portions of the agreement would be cancelled.
We affirm case number 82-52. We reverse the second case. We hold that the plaintiff in neither case met its burden of proof under established legal criteria for the cancellation of restrictions of the type involved here.
In 1959 Gulf Supermarkets, Inc. ("Gulf"), the owner of a parcel of real property in Hillsborough County, conveyed more than half of the parcel to Montgomery Ward & Company, Inc. ("Ward"). In conjunction with that sale, Gulf and Ward entered into a reciprocal parking agreement dated February 18, 1959, which was recorded in the public records of Hillsborough County. The agreement stated that it would constitute a covenant running with the land for fifty-five years from the date of the conveyance to Ward. The two parcels resulting from the conveyance will hereinafter be referred to as "the Gulf parcel" and "the Ward parcel."
Relevant portions of the agreement included the following: Paragraph 1 provided that Gulf and Ward would each have a nonexclusive right to use the driveways, parking areas, sidewalks, pedestrian malls and other common areas that were to be placed on both parcels. Paragraph 7 provided that each party agreed to pave and grade the parking area on its respective portion of the property. In paragraph 9 each party agreed that the parking areas on its parcel would be at least three times the gross floor area of all buildings on that parcel.
After the agreement was executed, Gulf constructed and operated on its parcel a supermarket which is now operated under lease to a third party. Later another portion of the parcel was leased to another third party for the operation of a drug store. The present owners of the Gulf parcel will hereinafter be referred to as "the Grecos." Ward constructed and operated a retail department store on its parcel. In March, 1960, Ward conveyed the Ward parcel to a wholly-owned subsidiary now known as M-W Properties ("M-W").
On December 15, 1980, approximately two months after the Ward store was closed, M-W entered into an agreement to sell the Ward parcel. The purchase rights under the contract were eventually assigned to AC Associates ("AC"), a Florida partnership. Closing of the sale was delayed while efforts were made to remove the covenants, imposed by the foregoing reciprocal parking agreement, from the parcel. Those efforts culminated in the predecessor-in-interest of AC filing a declaratory judgment action against the Grecos seeking a determination of whether the reciprocal parking agreement contained enforceable restrictive covenants affecting the Ward parcel and, if so, to have the agreement modified and the covenants cancelled. AC plans to build on the Ward parcel an office-retail-hotel complex. AC asserts that to fulfill its plans and to comply with the agreement's requirement that the parcel contain three times as much parking space as building floor space would unreasonably require construction of six twenty-story parking garages. The findings of the trial judge in the second case indicate that AC has no obligation to close the purchase from M-W. It was on that basis that the trial judge ruled that M-W, as owner of the property, had standing to contest the restrictions. Apparently, if AC chooses not to close, it will lose certain deposit monies.
As stated above, the first suit to modify or cancel portions of the reciprocal parking agreement (case number 82-52) ended in a final judgment denying relief. AC's predecessor-in-interest argued in that case that *1125 substantial changes in the character of the neighborhood surrounding the property justified modification or cancellation of the restrictive covenants. The trial judge, citing Allen v. Avondale Co., 135 Fla. 6, 185 So. 137 (1938), concluded that changes in a neighborhood sufficient to justify modification or cancellation of a restrictive covenant must have taken place after a complainant acquired title to the property or entered into an agreement to purchase the property, particularly where the complainant had actual knowledge of the restrictive covenant at the time it acquired the property. The court ruled that the changes in the neighborhood surrounding the parcel in question had occurred prior to the time AC's predecessor-in-interest had entered into the 1980 agreement to purchase the property from M-W. Therefore, the court concluded that no modification or cancellation of the restrictive parking agreement was appropriate. AC's predecessor-in-interest appealed that judgment to this court.
While the first appeal was pending, M-W filed suit against the Grecos to modify or cancel portions of the reciprocal parking agreement. This second case alleged that changes in the character of the neighborhood had occurred during M-W's ownership of the property. The trial court in the second case agreed with M-W and, as stated above, entered a final judgment modifying the agreement for the remainder of its term and removing the provisions which required that parking areas be three times the gross floor area of all buildings on the parcels. The court substituted instead various detailed parking provisions, specifying the amount of parking to be made available depending upon the amount of retail and office space and number of hotel rooms constructed on the parcel. The trial court also limited to 100 spaces the parking on the Ward parcel available to the Gulf parcel, and, among other things, specified the sizes of parking spaces on the Ward parcel. The final judgment provided that, if a court of appeal determined that the trial court did not have the power to modify the agreement, then the trial court declared null and void certain provisions of the reciprocal parking agreement affecting the Ward parcel and establishing a parking ratio and a right to park thereon. The Grecos appealed that judgment to this court.
The main issue on appeal is whether the parking agreement restrictions can properly be judicially modified or cancelled. We hold that they cannot be. In outlining our reasoning further below, we refer to the contentions of the parties as to whether easements or restrictive covenants, or both, are involved. We explain our belief that the parking agreement restrictions cannot be cancelled or modified, whichever label  easements or restrictive covenants  is placed upon various of the agreement's provisions. We point out the contentions of M-W as to the types of changed conditions on which it relies to argue for cancellation or modification of restrictions, and why, under applicable legal tests, those types of changes do not, in our view, justify the relief awarded in the second case. We point out that we do not believe that in this case a court should undertake to reshape the contractual rights and obligations of the parties and that, regardless of arguments in favor of the reasonableness of the type of modification which was judicially made, the precedent which would be set by such judicial involvement in this case in a basically private contractual process would be inappropriate. We further note that the problems which M-W and AC seek to overcome through the suits to dispose of present parking restrictions appear to be fundamentally brought about by AC's plans for a particular type of office-retail-hotel development on the Ward parcel, not by the changes in the neighborhood and industry practices concerning retail parking which M-W and AC point to. The law does not permit cancellation of property restrictions for the purpose of accommodating the best or most profitable use of a particular piece of property affected by the restriction. All of the parties involved, AC, M-W, and the Grecos, acquired their interests with full knowledge of the parking agreement.
*1126 The agreement gives the Gulf parcel parking rights over all of the parking on the Ward parcel. But how much of the Ward parcel is available for parking is governed by the covenant as to the three-to-one parking-to-building ratio. The Grecos argue that relevant provisions of the agreement create easements which cannot properly be changed, as did the trial judge in the second case, so as to limit the Gulf parcel to 100 parking spaces on the Ward parcel. In response, M-W refers to cases, including Crutchfield v. Sebring Realty Co., 69 So.2d 328 (Fla. 1954), and Costin v. Branch, 373 So.2d 370 (Fla. 1st DCA 1979), in support of its argument that rights of easement holders (the Grecos) over a servient estate (the Ward parcel) can be limited so that each party might reasonably enjoy its respective property rights. The cited cases, however, stand for the proposition that "the burden [of an easement] upon a servient estate must not be increased to any greater extent than reasonably necessary and contemplated by the parties at the time of [its] initial acquisition." Crutchfield, 69 So.2d at 330. The decisions in those cases did not authorize a judicially-directed lessening of a burden upon a servient estate, as compared to that originally contemplated by the parties. Such a lessening of that burden was the result of the trial judge's decision in the second case which modified the agreement and reduced the parking spaces on the Ward parcel available to the Gulf parcel. But "the legal extent of the right ... must ... be ascertained from the intention of the parties at the time when the right was created." Crutchfield, 69 So.2d at 330. There was no evidence from which it could have been determined in the second case that the lessening of the Gulf parcel's parking rights on the servient estate (the Ward parcel) was the intention of the parties to the agreement.
M-W also argues that the parking obligations include restrictive covenants running with the land and that changed circumstances justified the trial judge's modification or cancellation of the requirements, including the requirements that parking spaces on the Ward parcel be maintained in the foregoing three-to-one ratio. M-W ably argues that current circumstances, as compared to those existing at the time the agreement was entered into, render such restrictive parking covenants inequitable and unreasonable. However, in our view the restrictions cannot properly be cancelled or modified under the law relating to restrictive covenants. Restrictive covenants may well be cancellable under less stringent standards than those applicable to cancellations of easements. But since we find that the covenants in the parking agreement were not properly cancellable under the law relating to either cancellations of easements or restrictive covenants, we need not deal in any detail with legal niceties which may surround distinctions between easements and restrictive covenantsapplied to different provisions in the parking agreement.
The evidence presented by M-W was that substantial changes had occurred in the neighborhood surrounding the subject property. There was testimony that in 1959 when the parking agreement was executed the surrounding neighborhood was primarily residential and that since that time the use and character of that neighboring land has shifted to primarily commercial. The testimony was also that since 1959 urban planning and land-use concepts have changed and, with the cost of land and transportation now higher, freestanding department stores (such as that built on the Ward parcel) are no longer the most profitable.
There was further expert testimony that certain industry standards for parking have changed substantially since 1959. The ratio required by the 1959 agreement equals approximately ten parking spaces per 1,000 square feet of store space. There was testimony that industry standards for parking requirements currently range between 4 and 5.5 parking spaces per 1,000 square feet of retail space. The Ward company policy has abandoned the old parking standard which led to the 1959 agreement and now uses a formula of between *1127 4.5 and 6 parking spaces per 1,000 square feet of retail store area. M-W argues that the change in the characteristics of the neighborhood as well as the change in standards for parking spaces show that the 1959 parking restrictions are an unnecessary and oppressive burden on the Ward parcel.
However, in an action to cancel a restrictive covenant the test is whether or not the covenant is valid on the basis that the original intention of the parties can be carried out despite alleged materially changed conditions or, on the other hand, whether the covenant is invalid because changed conditions have frustrated the object of the covenant without fault or neglect on the part of the party who seeks to be relieved from the restrictions. See Barton v. Moline Properties Inc., 121 Fla. 683, 164 So. 551 (1935). If a restriction on the servient estate was for the benefit of, and is still of substantial value to, the dominant estate, it will be enforced regardless of changed conditions. Barton, 164 So. at 557; Acopian v. Haley, 387 So.2d 999, 1001 (Fla. 5th DCA 1980). Although a reciprocal parking agreement is involved here, these appeals deal primarily with parking restrictions burdening the Ward parcel and the asserted benefit to the Gulf parcel. Therefore, for present purposes we have treated the Gulf parcel as the dominant estate and the Ward parcel as the servient estate. It does not appear from the record that M-W satisfied its burden of proof under the foregoing test and that the parking agreement is, or necessarily will be, of no substantial benefit to the Gulf parcel, however excessive in scope it may be for the Ward parcel in relation to present industry standards for retail parking.
Unlike numbers of other cases which have cancelled restrictive covenants, the situation before us is not one in which residential property is burdened with a residential type of covenant which restricts commercial development and renders the property virtually useless when the character of the surrounding neighborhood has changed from residential to commercial. In this case, the subject property was a proposed commercial development at the time of the 1959 agreement and continues to be of commercial use. There has been no showing that commercial development of the Ward parcel was not foreseeable and, in fact, foreseen at the time of the parking agreement. See Wahrendorff v. Moore, 93 So.2d 720, 723 (Fla. 1957). We do not believe the burgeoning commercial development the evidence shows to have existed in the surrounding area is basically determinative of whether the parking restriction is unreasonably burdensome by reason of changed circumstances. The parking agreement and the changes in the surrounding neighborhood do not prevent commercial use of the property. Nor is it clear in the final analysis how, if at all, the changes in the character of the surrounding neighborhood  which are strongly asserted by M-W as grounds for relief  can be the cause of the current problem with the parking-to-building area ratio which M-W wants cancelled or modified.
As to the alleged changes in industry practice regarding the amount of parking space needed for retail stores, we recognize M-W's argument that the typical amount of land devoted to retail parking today is approximately one-half of that required by the 1959 agreement. If the parties were negotiating a reciprocal parking agreement today, presumably they would include a lower ratio of parking area to store space. However, the issue before us is not what the parties would do today, but rather whether the parking restrictions remain substantially capable of serving purposes intended when the restrictions were imposed, e.g., apparently to provide the Gulf parcel with parking areas on the Ward parcel and to serve to protect the Gulf parcel from a potential overflow of cars from the Ward parcel. The record does not show that the parking restrictions will fail to serve their purposes. It only shows that under present circumstances the scope of the restrictions is greater than necessary for those purposes.
*1128 As to one of those purposes, M-W argues the evidence shows that the parking on the Ward parcel is of no use to the Gulf parcel because the customers of the retail establishments, a Kash 'n Karry supermarket and an Eckerd's drugstore which are presently lessees on the Gulf parcel, do not need and have never needed extra parking on the Ward parcel. The Grecos cite testimony that removal of the restrictions would harm the Gulf parcel. However, regardless of the accuracy of the conflicting contentions under present conditions, the terms of the reciprocal parking agreement continue in effect for thirty more years. The basic terms of the Kash 'n Karry and Eckerd's leases will expire at different times substantially prior to the expiration of the parking agreement. M-W has not established that the parking rights given by the agreement to the Gulf parcel are not of benefit, and cannot during the term of the agreement be of benefit, to the Gulf parcel.
The trial judge in the second case, as the first type of alternative relief under the final judgment, modified the agreement and, among other things, provided that 100 parking spaces on the Ward parcel be made available to the Gulf parcel, rather than cancelling portions of the agreement as provided in the second form of alternative relief. A conclusion which can be drawn is that the trial judge thereby recognized significant continuing benefit to the Gulf parcel from the agreement and indicated a desire to not take away from the Gulf parcel all such benefit. The record otherwise shows the trial judge's definite concern with providing parking benefits on the Ward parcel to the Gulf parcel.
The other of the foregoing indicated purposes would also seem to be of actual or potential importance. Benefit to the Gulf parcel from the parking ratio imposed on the Ward parcel appears to be that the large ratio of parking space to store space helps to ensure that businesses on the Ward parcel will have sufficient parking for their needs so as to reduce potential for their customers to park on the Gulf parcel. There is no evidence that this aspect of the reciprocal parking agreement would not be of continuing potential, or actual future, benefit to the Gulf parcel. We do not believe it has been established that available parking areas on the Ward parcel will render inapplicable the foregoing benefit to the Gulf parcel. Whether or not there will be ample parking for immediate needs on the Ward parcel under the current plans (which presumably could be changed) for the new development of that parcel, there appears to be no assurance that future circumstances will result in ample parking on the Ward parcel under either that development or some other conceivable use of the Ward parcel during the term of the agreement. Potential for the future is a proper consideration in evaluating the benefit of a restrictive covenant to real property. See Sinclair Refining Co. v. Watson, 65 So.2d 732 (Fla.), cert. denied, 346 U.S. 872, 74 S.Ct. 121, 98 L.Ed. 381 (1953). In its Sinclair opinion the Florida Supreme Court included at least two statements pertinent to the case at hand:
[T]he public policy of this state and this nation favors the fullest liberty of contract and the widest possible latitude in the disposition of one's property, so long as no disposition is sought to be made contrary to public policy or express law and so long as the restraint is within reasonable bounds.
Id. at 733. The restriction in the case at hand was not contrary to law or policy and there is raised no question as to its reasonableness when it was created.
While the property [restricted in Sinclair for a right-of-way] may not be immediately needed, we cannot go so far as to say that it will never be needed in the future.
Id. at 734.
To say that there will never be any benefit (or any more benefit) to the Gulf parcel from the restrictions would require judicial prognosticating which we believe is not the province of a court under facts like those in this case. In a situation involving a contract for the future, entered into for valuable *1129 consideration, the prognostication responsibility is, as a general rule, that of the contracting parties. There is no showing that M-W's parent corporation at the time of the agreement in 1959 was not, or could not have been, as fully informed as were the Grecos' predecessors. Also, AC was aware of the existence of the agreement when it acquired its contractual interest in the property.
There was additional evidence in the second case that Eckerd's and Kash 'n Karry expressed concurrence with the type of modification of the parking agreement affected by the final judgment in that case which, among other things, provided 100 parking spaces on the Ward parcel for the Gulf parcel. It appears that that concurrence was given in consideration of monies paid to those lessees and of assurances to them of the type which were incorporated into the final judgment in the second case in the form of modifications to the agreement, e.g., the foregoing 100 parking spaces. The record shows that the trial judge in his final judgment modifying the parking agreement wanted to protect the interests of those lessees by additionally ensuring that there would be conveniently-located parking spaces available for them on the Ward parcel. But of at least equal importance are the expiration dates of those leases, one expiring in approximately one year and the other in 1997, whereas the parking agreement's term continues until 2011. Unexercised options to renew seem irrelevant because there is no obligation to renew and no evidence that there will be renewal. In fact, the Grecos assert to the contrary, and the trial judge in the second case found that the Grecos, as owners, had standing to contest the cancellation and modification of the agreement. Negotiations between M-W or AC and those lessees presently occupying the Gulf parcel should not control the rights of the owners of the Gulf parcel, especially when ownership rights are affected long after those lessees apparently may cease to have any interest at all in the Gulf parcel.
The trial judge in the second case, finding that the modification made by the final judgment to the parking agreement would not hurt the Gulf parcel, gave material weight to the concurrence of those lessees to the modification. However, the issue is not whether a judicial modification of the agreement would now hurt the Gulf parcel or whether it would, as it does, give benefit to the Gulf parcel. The issue is whether the unmodified agreement continues to provide benefit to the Gulf parcel. See Barton v. Moline Properties, Inc., supra. Again, that it was felt necessary to provide continuing parking benefits to the Gulf parcel and its present lessees in the modification of the agreement contained in the final judgment in the second case supports the position that the agreement, negotiated by the parties' predecessors, continues to provide significant benefit to the Gulf parcel. If there was no continuing benefit to the Gulf parcel, there would have been no reason for the modification to ensure benefit to the Gulf parcel.
To the extent the agreement may be termed unreasonable for the currently-planned use of the Ward parcel in the sense of requiring parking areas unnecessarily broad in scope, any such unreasonableness was contractually, and not judicially, created. The role of the courts is not to make an otherwise valid contract more reasonable or less unreasonable from the standpoint of one contracting party. Cf. 11 Fla.Jur. Contracts § 63, saying:
It is fundamental that adult persons suffering from no disabilities have complete freedom of contract. The mere fact that the consideration is inadequate does not render a contract nudum pactum, for it is not essential that the consideration be adequate in point of value, since the law cannot decide upon this matter.
The court will not ordinarily inquire into the adequacy of the consideration. And the court will not interfere with the facility of contracting and the free exercise of the will and judgment of the parties by not allowing them to be sole judges of the benefits to be derived from *1130 their bargains, provided there is no incompetency to contract, and the agreement violates no rule of law. As the law will not stop to scrutinize the amount of benefits conferred upon one party, so neither will it scan the extent of trouble, loss, or obligation the other party has subjected himself to.
As shown by the Barton and Acopian citations, supra, the foregoing types of concepts apply to a contractual covenant affecting real property where the claim of one contracting property owner of lack of benefit to the other contracting property owner from the covenant during its remaining duration has not been shown. In fact, in this case M-W has not established that whatever benefit, however potential, which has ever existed for the Gulf parcel from the agreement is now significantly different from or less than the situation at the time the agreement was entered into. The general rule is that contractual property rights are subject to change by the mutual consent of the contracting parties, not by the courts. See, e.g., Kotick v. Durant, 143 Fla. 386, 196 So. 802, 806 (1940); Florida Power Corp. v. Hicks, 156 So.2d 408, 410 (Fla. 2d DCA 1963), cert. denied, 165 So.2d 177 (Fla. 1964).
We recognize that the trial judge in the second case carefully undertook to do equity between the parties. Certainly that undertaking was meticulously implemented. However, the effect of the final judgment appears as a judicial renegotiation of the agreement for the parties which we cannot agree in these circumstances comports with established law.[1] Nor are we convinced that even if we felt entitled under existing law to affirm the second case, sound legal precedent would thereby be established for other similar cases in the future. We have in mind such things as a basic purpose of the law being to provide stability and certainly through consistent application of legal principles and the uncertainty which would result for other similarly situated property owners if we affirmed the second case. Surely the degree of actual or potential benefit from many property restrictions may vary throughout their durations. Substantial uncertainty for property owners as to rights and obligations would, we believe, result under circumstances like this if courts, at the instance of a suing property owner and over the objection of adjacent property owners, could modify or cancel a commercial (or residential) property restriction on the basis that it is unreasonable by reason of a different type of commercial (or residential) use planned by the suing property owner. This would especially appear to be the case when, as here, the commercial uses of the adjacent property, which is the only other property covered by the restriction, have remained the same. As a general rule, property owners accommodate to property restrictions, not vice versa.
There are surely numerous property ownership situations in which there are grounds for a property owner to contend that an otherwise valid contractual commercial restriction has become less desirable or even undesirable with the passage of time. There may well be even more such comparable situations for residential properties affected by valid restrictions. Under the law those situations have in common with the case before us the generally applied concept that a new property use which is planned and which is of the same character (e.g., commercial or residential) as the use at the time the restriction is agreed to should be accommodated to the restriction even if at greater cost than would be the case without the restriction, rather than accommodating the restriction to the new use.
To put this type of situation in a perhaps more generally understandable context, we *1131 could use the more or less comparable analogy of property restrictions which may affect the owner of residential property on which a building or a building modification is planned. The expense of accomplishing a change in a house, or of the building of a new house, on residential property on which there is a certain residential restriction may be greater than it would be without the restriction. But that in itself would not justify judicial cancellation or modification of the restriction even if, under new standards or construction techniques for houses, the change or new house which would be inconsistent with the restriction would be better or of more value to the property owner. Whether or not the effect of modifying or cancelling a restriction would be to produce more value to the property of the owner whose predecessor contracted for the restriction and who seeks the change is not legally determinative.
We do not mean that we find the arguments of M-W and AC to be unreasonable regarding current economic factors affecting the Ward parcel. In fact, it is the persuasiveness of those arguments as to the reasonableness of the action by the able trial judge in the second case which makes this a difficult matter on appeal. We only mean that we believe those arguments must be basically for the consideration of the parties among themselves at the time the agreement is made by the original contracting parties, at the time the obligations of the agreement are undertaken by their successors-in-interest, and now. What is now, or in the long run, best for the Gulf and Ward parcels together, in terms of available parking, is something which we do not feel, under the circumstances of this case, should be our province to say, as long as benefit to the Gulf parcel from the agreement during its duration is not shown to have ended.
M-W, arguing that the parking restrictions are an oppressive burden on the Ward property, cited evidence that, under the plans for the proposed office-retail-hotel complex to be built on that property, the three-to-one parking ratio would require the construction of six twenty-story parking garages. While this would appear unreasonable, any such unreasonableness would seem to be due to the nature and size of the planned complex. M-W has not established that the Ward property cannot be commercially used in other ways while still affected by the obligations and rights of the reciprocal parking agreement. M-W points to testimony which it presented to the effect that the Ward parcel, as affected by restrictions in the parking agreement, lacked value. However, whether or not relative values of the servient estate with and without a restriction are determinative under the foregoing tests of Bartin v. Moline Properties, Inc., there was also testimony on behalf of M-W that the property was not valueless, and the trial judge in the second case made no finding that the Ward parcel, as affected by the parking agreement, lacked value. In fact, the trial judge, in sustaining an objection to testimony about other potential uses of the Ward parcel with the restrictions in effect, expressed the belief that M-W was not contending, nor could it validly contend, that there were not other such uses for the Ward parcel. M-W argued at the trial that the Ward parcel, restricted by the agreement, cannot be put to its highest and best use. Its argument on appeal appears to be to the same effect. For example, M-W argues that free-standing department stores (the type contemplated by the three-to-one parking-to-building ratio) are no longer the most profitable and that the Ward store before it closed was only marginally profitable. Yet the fact apparently is that a profitable store was operated on the Ward parcel, with the restrictions, shortly before AC contracted to purchase the parcel. A highest and best use criterion is not the correct test by which to determine the continued validity of a restrictive covenant.
The trial court found that the highest and best use of appellees' property would be the proposed condominium use, but, while this may be a good test in other situations, it is not the correct test in *1132 determining continued validity of restrictive covenants.
Acopian, 387 So.2d at 1002.
Thus, while M-W has shown changed circumstances, it has failed to meet its burden of showing that material change has destroyed all substantial benefit of the restriction and has defeated under present or future circumstances the purpose of restrictions under the reciprocal parking agreement.
We find no merit in the remaining points raised in these appeals. Accordingly, the final judgment in appeal number 82-52 is affirmed. The final judgment in appeals numbered 83-118 and 83-119, modifying the reciprocal parking agreement or, in the alternative, cancelling portions of that agreement, is reversed, and that cause is remanded for entry of judgment in favor of defendants.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT HEREWITH.
OTT, C.J., and SCHOONOVER, J., concur.
NOTES
[1] In formulating the modifications to the agreement the trial judge consulted with the attorneys for M-W and AC and, although stating that the Grecos did not have the option to either agree to the modifications or abide by a cancellation, he did ask to receive their preference and delayed the final judgment until receiving their response. They declined a response to avoid waiver of rights. The record specifically reflects the judge's desire to not cancel, but to modify, the agreement.