EWB-I, LLC, Appellant

v.

PLAZAMERICAS MALL TEXAS, LLC; Sharpstown Mall Texas, LLC; Burlington Coat Factory Realty of Bellaire, Inc.; Mai & Matthew, R.E.I., Inc.; CCW, LLC; Smith, FLP, Ltd.; and LG Sharpstown Bellaire, LLC, Appellees

NO. 01-15-00527-CV

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued June 6, 2017

Justin M. Waggoner, SMYSER KAP-
LAN & VESELKA, L.L.P., 700 Louisiana
Street, Houston, TX 77002, David K. Bis-
singer, SIEGMYER, OSHMAN & BIS-
SINGER LLP, 2777 Allen Parkway, Tenth
Fl, Houston, TX 77019, for Appellant.

Michael D. Morfey, Cole B. Conkling, Courtney B. Glaser, ANDREWS KURTH LLP, 600 Travis, Suite 4200, Houston, Texas 77002, Clinton W. Twaddell, III, James H. Robichaux, BRANSCOMB|PC, 802 North Carancahua, Suite 1900, Corpus Christi, Texas 78401-0036, Jeffrey C. Alexander, C. Davis Bradford, 4601 Washington Avenue, Suite 300, Houston, Texas 77007, DOBROWSKI, LARKIN & JOHNSON, L.L.P., Patrick J. McGettigan, 7600 North Capital of Texas Highway, Building, B, Suite 110, Austin, Texas 78731, for Appellees.

Panel consists of Justices Massengale, Brown, and Huddle.

## OPINION

Harvey Brown, Justice

This appeal arises out of a dispute over the continuing enforceability of restrictive covenants governing the Houston shopping center formerly known as Sharpstown Mall.

EWB-I LLC owns five overflow parking areas along the southern and eastern edge of the mall property that are alleged to be underutilized. EWB ("Overflow Owner") wishes to develop these overflow parking areas for commercial use, including possibly constructing a free-standing bank on one of the lots, but there are long-standing restrictive covenants that limit the use of these areas to only parking for the mall structure. Overflow Owner filed suit against all other entities to which the mall complex's restrictive covenants apply, seeking a declaratory judgment that various covenants are no longer enforceable, as well as injunctive relief and damages.

There are seven defendants in the suit: PlazAmericas Mall Texas, LLC ("PlazAmericas Texas"); Sharpstown Mall Texas, LLC ("Sharpstown Texas"); Burlington Coat Factory Realty of Bellaire, Inc.; Mai & Matthew, R.E.I., Inc.; CCW, LLC; Smith, FLP, Ltd.; and LG Sharpstown Bellaire, LLC. Each holds an ownership interest in one of the structures within the mall complex. These defendants (referred to collectively as "Structure Owners") own the three anchor-tenant buildings, the main mall building where smaller retail tenants sell their goods, an adjacent office building, and an on-site parking garage. The party that owns the main mall building also owns the parking surface lots closest to the mall. That party is PlazAmericas Texas, which acquired its interest from Sharpstown Texas.

Structure Owners moved for summary judgment and for dismissal of Overflow Owner's suit. The trial court granted Structure Owners summary judgment on Overflow Owner's declaratory judgment claims and dismissed the injunctive relief claims for lack of jurisdiction. Ultimately, the trial court entered a take-nothing judgment in favor of Structure Owners on all Overflow Owner's claims and awarded attorney's fees.

Overflow Owner appeals, arguing in seven issues that the trial court erred by granting summary judgment, dismissing its claims for injunctive relief, awarding attorney's fees, entering a final judgment without finally disposing of all claims, and striking certain summary-judgment evidence. We reverse the judgment and remand for further proceedings consistent with this opinion.

## Background

Sharpstown Mall was developed more than 40 years ago as the first enclosed, air-conditioned shopping mall in Houston. It was a premiere retail facility with three anchor tenants: Montgomery Ward, J.C. Penney, and Foley's. The three anchor tenants were connected by a large main mall structure that housed additional,

smaller retailers. Between the main mall structure and the primary surface parking lots was a multi-floor office building.

To accommodate the traffic to this regional mall, the developer constructed a three-story parking garage near the Foley's store as well as surface-level parking at each end of the property and along the perimeter of two sides of the property as shown below:

No single entity owned all the realty for this project. Each anchor-tenant location had a separate owner. The office building had a separate owner. And the original mall developer owned what was left: the main mall structure and all of the parking areas, including the parking garage, the surface parking areas surrounding the mall structure, and the five overflow parking areas. Thus, as originally configured, every owner held an ownership interest in at least one building; no party owned only parking lots. And the success of the entire mall complex required the owners to work together.

To ensure a cohesive approach to the development of the mall, all the various owners, in 1979, entered into or consented to a contract—a Restated Operating Agreement ("ROA")—that contained various restrictive covenants. The ROA stated that it would be binding on all parties and their successors and assignees until termination of the agreement in 2035 or earlier by agreement. The ROA was part of a "major overhaul" of the mall that added a second story, a food court, the J.C. Penney store, and a parking garage. It governs all aspects of the operation of the mall and the mall complex, including security, maintenance, ingress, egress, and parking. Adequate parking was vital to the success of the entire mall complex.

One of the ROA restrictions was that the parking area (which was defined to include the parking garage and all surface parking lots) had to contain no less than five parking spaces for each 1,000 square feet of floor area in the mall. "Floor area" was defined to include all the floor space in the mall, regardless of whether it was actively being used for retail sales. It prohibited parties from diminishing the area on each party's parcel reserved for parking or from placing obstructions or permanent improvements of any kind in the parking area or parking garage.

Over the years, individual portions of

the mall were sold to various successors.[1] In 2004, for the first time, ownership of some of the parking areas was transferred to a party that did not also own one of the mall structures. Ownership of the five overflow parking lots was transferred by one of the Structure Owners to a related entity, NBC–Bellaire Parcel Development, LLC. The newly formed entity then used the five overflow parking lot as collateral for a nearly $6 million loan. Appellant EWB is the current successor to the lender. In 2008, NBC-Bellaire defaulted, and the following year, in May 2009, EWB (referred to throughout as Overflow Owner) foreclosed on the five tracts and became the owner of the overflow parking

area. Both before and after Overflow Owner obtained its ownership interest, Sharpstown Mall was changing. More specifically, it was declining.

## A. The mall's decline

Sharpstown Mall was developed as a "first class regional shopping center." But the mall went through a period of transition and decline in the 1990s and 2000s. All three anchor tenants closed within a ten-year period: J.C. Penney closed in the late 1990s; Montgomery Ward closed next; and Foley's, which was the largest and considered the main anchor of the mall, closed last, in 2007.[2]

---

1. For convenience, we include a chart listing the current owners of each portion of the mall and the party that held that interest when the ROA was signed.

In 2010, the J.C. Penney location re-opened as "Clarewood Mercado," which is a collection of small, individual vendors. The Montgomery Ward store was replaced by a retailer with a smaller national presence, Burlington Coat Factory. And the Foley's site was padlocked and has remained empty.[3]

Without anchors to draw traffic to the mall, the character of the retailers filling the main mall structure also changed. The mall retail space was set up as a "flea-market"-style shopping area. Photographs depict caged, micro-retail stores surrounded by vast areas of unused space. There is evidence that the flea-market shopping area did not draw the level of traffic that Sharpstown Mall once enjoyed. There is also evidence that the parking lots would no longer fill, even during the height of Christmas shopping season.

Seeing its parking areas go unused, Overflow Owner sporadically allowed traveling carnivals to operate on its parking lots. These carnivals have popped up for many years, though the parties dispute the frequency and whether any parties to the litigation have ever objected to their operation.

In 2011, PlazAmericas Texas, which owned the main mall structure, the primary surface parking areas, and the parking garage, closed the parking garage to the public. The parking garage was closed despite the ROA requirements that parking areas may not be diminished or obstructed and that a minimum of five parking spaces remain available for every 1,000 square feet of mall floor area.

## B. Overflow Owner sues to modify the ROA

In 2010, Overflow Owner sued Structure Owners. Overflow Owner sought, among other claims, a declaratory judgment that the ROA's parking restrictions were unenforceable and that the ROA be modified to allow reasonable retail development of its overflow parking lots under the changed-conditions and waiver doctrines or, alternatively, it sought a permanent injunction requiring all Structure Owners to fully

| Current Interest Owner(s) | Original Party to ROA | Portion of Mall |
|---|---|---|
| EWB-I LLC | AMP Associates | Overflow parking areas |
| PlazAmericas Mall Texas, which succeeded Sharpstown Mall Texas, LLC | AMP Associates | Main mall structure |
| Mai & Matthew REI Inc. | J.C. Penney | Anchor space |
| CCW LLC | Federated Department Stores (Foley's and Macy's) | Anchor space |
| Burlington Coat Factory Realty of Bellaire, Inc. and LG Sharpstown Bellaire, LLC | Sacward Properties (Montgomery Ward) | Anchor space |
| Smith FLP Ltd. | Robert Hammett, George Underwood, and Y.A.N. Management | Office building |

2. Before it closed, Foley's had changed to a Macy's location.

3. The owner of that area has adopted a plan of opening a shopping area in the space with "hundreds of small tenants."

comply with the ROA.[4]

Structure Owners and Overflow Owner filed competing motions for summary judgment on Overflow Owner's claims for declaratory judgment. Structure Owners also moved to strike portions of Overflow Owner's summary-judgment evidence. The trial court struck certain exhibits relied on by Overflow Owner's expert witness, Joe Webb. It then granted partial summary judgment to Structure Owners and denied Overflow Owner's motion. The trial court also sustained Sharpstown Texas and PlazAmericas Texas's plea to the jurisdiction, in which they argued that Overflow Owner lacked standing to enforce ROA covenants because Overflow Owner was not an intended beneficiary of the covenants and suffered no injury from their alleged violations. The trial court dismissed Overflow Owner's injunctive claims without prejudice.

Through these interlocutory orders, all Overflow Owner's causes of action were dismissed or adjudicated, leaving the award of attorney's fees as the sole remaining issue. Overflow Owner opposed any fee award, arguing that its request for declaratory relief was an action to remove a cloud on title, for which fees cannot be recovered. The trial court granted Structure Owners' motion for attorney's fees and entered a final judgment incorporating all of its interlocutory summary judgments, dismissals, and fee orders.

Overflow Owner now appeals, arguing that the trial court erred in granting summary judgment on its declaratory-judgment claims, dismissing its claims for injunctive relief, striking portions of its summary-judgment evidence, and awarding attorney's fees to Structure Owners.

### Summary Judgment on Declaratory-Judgment Claims

Overflow Owner sought a declaratory judgment that the ROA's requirement of maintaining five available parking spaces for every 1,000 square feet of mall floor area—a restriction that arguably prevents the use of the overflow lots for other commercial purposes—is unenforceable and subject to judicial reformation on two independent theories: changed conditions and waiver. Several Structure Owners filed motions for summary judgment or joined in others' motions for summary judgment on the theories of changed conditions and waiver. First, Smith moved for summary judgment on the changed conditions theory. Burlington joined Smith's motion. Second, Sharpstown Texas moved for partial summary judgment on the declaratory judgment claims generally, arguing that there had not been sufficient change in conditions and that it had not waived any restrictions through a course of action within the overflow lots. Three co-defendant Structure Owners joined Sharpstown Texas's motion: PlazAmericas Texas, Burlington, and CCW. The trial court granted both motions and dismissed Overflow Own-

---

**4.** Overflow Owner also asserted a conversion claim, which it voluntarily dismissed, as well as breach-of-contract and promissory-estoppel claims, which were denied through summary judgment. None of those claims are being appealed.

Sharpstown Texas also brought a third-party petition against Ring & Ring, Inc. d/b/a Wright's Amusements, a carnival operator, for interference with easement rights and violation of the ROA, seeking injunctive re-

lief. Ring & Ring countersued Sharpstown Texas, seeking a declaratory judgment and sanctions, alleging that Sharpstown Texas brought its claims in bad faith. The trial court later severed all claims by and against Ring & Ring. An appeal in that case is pending in this Court as *Ring & Ring, Inc. d/b/a Wright's Amusements v. Sharpstown Mall, Texas, LLC & PlazAmericas Mall Texas, LLC*, No. 01-16-00341-CV (Tex. App.—Houston [1st Dist.] filed Apr. 1, 2016).

er's declaratory-judgment claims as to all Structure Owners, meaning that the trial court rejected the changed conditions and waiver theories as a matter of law and concluded that Overflow Owner could not prevail on either theory against any Structure Owner.

In its first issue, Overflow Owner challenges summary judgment against it on the changed-conditions and waiver arguments. If the trial court erred on either of the two theories, the summary judgment against Overflow Owner on its declaratory-judgment claims must be reversed.

## A. Standard of review

■ Structure Owners, defendants in the trial court action, sought summary judgment on both traditional and no-evidence grounds. *See* Tex. R. Civ. P. 166a(c), 166a(i). A defendant that files a traditional motion for summary judgment has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. Tex. R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). For a defendant to prevail on a no-evidence motion for summary judgment, the defendant must establish that there is no evidence to support an essential element of the plaintiff's claim on which the plaintiff would have the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the plaintiff to present evidence raising a genuine issue of material fact as to each

of the elements specified in the defendant's motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524.

■ We review a trial court's grant of summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When reviewing a summary judgment, we must (1) take as true all evidence favorable to the nonmovant, and (2) indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

■ In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). To discern intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We begin with the contract's express language. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805–06 (Tex. 2012). "If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law." *Id.* at 806. But, "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson*, 128 S.W.3d at 229. "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument be-

comes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).

## B. Summary judgment against Overflow Owner on claim of "changed conditions"

Overflow Owner sought a declaratory judgment that the ROA restrictive covenants were unenforceable due to changed conditions at the mall that left the restrictions incapable of achieving their purpose.

### 1. The changed-conditions doctrine

 A court may refuse to enforce a deed restriction when "there has been such a change of conditions in the restricted area or surrounding it that it is no longer possible to secure in a substantial degree the benefits sought to be realized through the [restriction]." *Cowling v. Colligan*, 158 Tex. 458, 312 S.W.2d 943, 945 (1958); *see* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 7.10 (2000) ("When a change has taken place since the creation of a servitude that makes it impossible as a practical matter to accomplish the purpose for which the servitude was created, a court may modify the servitude to permit the purpose to be accomplished. If modification is not practicable, a court may terminate the servitude."). If the reason for enforcing a restrictive covenant has ceased, equity will no longer enforce the covenant. *La Rocca v. Howard–Reed Oil Co.*, 277 S.W.2d 769, 772 (Tex. Civ. App.—Beaumont 1955, no writ). The doctrine is based on the "implied intent of the parties and public policy." RESTATEMENT: SERVITUDES § 7.10 cmt. a.

 To qualify as a "changed condition," the change cannot be minor; it must be "radical." *E.g.*, *Simon v. Henrichson*, 394 S.W.2d 249, 254 (Tex. Civ. App.—Corpus Christi 1965, writ ref'd n.r.e.); *see Lebo v. Johnson*, 349 S.W.2d 744, 749–50 (Tex. Civ. App.—San Antonio 1961, writ

ref'd n.r.e.); *Hemphill v. Cayce*, 197 S.W.2d 137, 141 (Tex. Civ. App.—Fort Worth 1946, no writ). It is not enough that a change reduces the value of the benefit sought to be realized through the restriction. But neither is it required that a change fully eliminate all benefits created by the restriction. Instead, to qualify as a radical change, it must eliminate a substantial part of the benefit sought to be achieved by the restriction. *Moseley v. Arnold*, 486 S.W.3d 656, 666 (Tex. App.—Texarkana 2016, no pet.); *see* RESTATEMENT: SERVITUDES § 7.10 cmt. c (stating that "the test is not whether the servitude retains value, but whether it can continue to serve the purposes for which it was created.... The test is a stringent one....").

 There are at least six factors that have been identified as relevant to determining whether changed conditions are extensive enough to warrant lifting restrictions: (1) the size of the restricted area, (2) its location with respect to where the change has occurred, (3) "the type of change that has taken place," (4) "the character and conduct of the parties or their predecessors in title," (5) "the purpose for which the restrictions were imposed," and (6) "to some extent the unexpired term of the restrictions." *Simon*, 394 S.W.2d at 254. Evaluating whether changes qualify as "radical" to warrant setting aside the parties' agreed restrictions is a fact-intensive analysis. *See Lebo*, 349 S.W.2d at 749. These factors are not viewed simply in terms of the effects the changes have had on the lots currently burdened by the deed restriction. *Cowling*, 312 S.W.2d at 946. Instead, the proper analysis requires that we balance the equities. *Id.*; *Gunnels v. N. Woodland Hills Cmty. Ass'n*, 563 S.W.2d 334, 338 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ).

Because a changed-conditions analysis is focused on the extent to which the changes eliminate a substantial part of the benefit sought to be achieved through the restriction, we first examine the underlying purpose of the agreed-upon restriction. *See Moseley*, 486 S.W.3d at 666. To determine purpose, we look initially to the terms of the restrictive covenant. *Id.* at 662. If the agreement is unambiguous, we determine the parties' intent from the language used in the document. *Id.* at 662–63. If the restrictive covenant is susceptible to more than one reasonable interpretation as to its purpose, it is ambiguous and creates a fact issue as to its purpose. *Id.* at 668; *see Indep. Am. Real Estate, Inc. v. Davis*, 735 S.W.2d 256, 258 (Tex. App.—Dallas 1987, no writ).

**2. The ROA is ambiguous as to purpose, preventing summary judgment**

Section 5.1 of the ROA mandates that a ratio be maintained of "no less than five automobile parking spaces ... for each 1,000 square feet of floor area." It further provides that no party shall take any action that would "diminish the area on [its] parcel reserved for automobile parking." And it places restrictions on the size of the mall floor area, while stating that those restrictions are "to assure that the parking ratio established in Section 5.1 shall be maintained." However, the ROA never states the purpose of the mandated parking ratio. Nor does it expressly address what occurs if parts of the mall floor area are left unoccupied for years, as has occurred.

The parties read into the document various intentions. According to Overflow Owner, the benefit that the parties intended to secure through the parking ratio requirement was *adequate* parking for the mall. Overflow Owner argues that, while "[e]xpansive parking lots were at one time necessary to support the large volume of shoppers national anchor tenants attract-ed," the overflow lots no longer serve that purpose because the mall never requires overflow parking. It concludes that the mall no longer needs, and is not reasonably likely in the future to need, the parking ratio specified in the ROA. According to Overflow Owner, because there is adequate parking close to the mall entrances, the restriction on the outer-most lots—the overflow parking lots it owns—no longer serves the restriction's purpose.

Structure Owners deny that the parties intended a quantitative analysis of parking need. They argue that the purpose of the restrictions was not necessarily to provide adequate parking but, more generally, to make the area available for parking. According to Structure Owners, the overflow lots "are still available for parking ... and ... Mall customers still use [them] for parking." Thus, they argue, the benefit sought to be secured is still fully capable of being realized: parking in this area of the property. They further argue that, between the time of this suit and the expiration of the ROA in 2035, it is possible that the Mall will acquire tenants with parking needs that would increase the use of the overflow lots for parking.

Looking to the terms of the agreement itself, there are some indications that the benefit sought to be realized by the restrictions was to ensure adequate parking for Mall visitors. As examples, the ROA mandates that the parties maintain a ratio of five available parking spaces for every 1,000 square feet of mall floor area, and it prohibits any party from charging a parking fee, which might deter visitors from making an otherwise free visit to the shopping mall.

But there also are indications that the parties intended the restrictions to continue even if parking were adequate without them. As examples, the ROA was given an extended period of enforceability—almost 60 years—even though it was at least pos-

sible that parking needs might change in the interim, and the ratio requirements in the ROA were based on total floor space at the mall, regardless of whether that floor space was actively being used for retail.

Perhaps the parties imposed the parking-related restrictions to ensure adequate parking for a mall comprising the same type of tenants as those occupying it in 1979, as Overflow Owner argues. Or perhaps the restrictions exist simply to ensure a certain amount of available parking, regardless of the number or type of tenants and customers, as Structure Owners argue. Neither of these possible purposes is made express in the ROA, nor is either contradicted. Both are reasonable interpretations. Accordingly, the ROA is ambiguous as to the restriction's purpose in restricting use of the overflow lots to parking.

This ambiguity creates a fact issue as to the restriction's purpose, and the fact issue precludes summary judgment on a "changed conditions" theory in Structure Owners' favor. *Moseley*, 486 S.W.3d at 668–69 (ambiguity on purpose of restrictive covenant precluded summary judgment because it was unclear whether restriction against development of truck stop on undeveloped intersection corner was intended to apply only so long as operating truck stop on opposite corner continued to exist or, instead, to apply regardless of whether operating truck stop existed); *see TX Far W. Ltd. v. Tex. Invs. Mgmt., Inc.*, 127 S.W.3d 295, 305–06 (Tex. App.—Austin 2004, no pet.) (holding that dispute with regard to parties' intent prohibits summary judgment).

**3. A fact issue exists regarding degree to which conditions have changed, further preventing summary judgment**

 Aside from the ambiguity regarding the restriction's purpose, summary judgment was also in error because fact issues exist concerning the extent to which the overflow lots actually are used for mall parking. *See Moseley*, 486 S.W.3d at 668–69 (determining that fact issue exists on whether conditions have changed to degree that justifies non-enforcement of restrictive covenant, precluding summary judgment).

In *Moseley*, a seller agreed to a restriction not to use the undeveloped portion of the land he retained to develop or operate as a truck stop when he sold the remainder of his property, which included an operating truck stop. *Id.* at 658–59. The effect of the restriction was that it prevented the seller from competing with the existing truck stop on the sold tract. *Id.* The existing truck stop was destroyed by fire and never rebuilt. *See id.* at 659 n.3. More than 20 years later, the owner of the land previously used as a truck stop argued that the restrictive covenant continued to prevent the development of a truck stop on the retained tract. *See id.* at 659. The owner of the retained tract argued that conditions had changed to such a degree—including the destruction of the truck stop that would have benefitted from the restriction—that the restrictive covenant should no longer be enforced. *Id.* at 660, 668. The trial court granted summary judgment to the party seeking to enforce the restriction. The appellate court reversed.

First, the appellate court noted that, "where the reason for enforcing a restrictive covenant has ceased, equity will no longer enforce the covenant." *Id.* at 663 (quoting *La Rocca*, 277 S.W.2d at 772). Moreover, "when the conditions have sufficiently changed, it may bring about a termination of the restrictive covenant." *Moseley*, 486 S.W.3d at 663.

Second, the appellate court highlighted two items of evidence supporting the argument that conditions had changed: (1) the truck stop that existed when the restrictive covenant was created was later destroyed by fire and had not been rebuilt in the 20 years that followed, and (2) the value of the retained tract was more than 10 times higher than the value of the sold tract if the retained tract could be developed commercially to support a truck stop, and there was no evidence that enforcing the covenant would substantially benefit the sold tract. *Id.* at 668–69 & n.13.

Third, the appellate court determined that fact issues existed with regard to the degree that conditions had changed, which prevented summary judgment in favor of enforcing the restrictive covenant. *Id.* at 666–69 (noting that evidence was ambiguous whether covenant was intended to support operational truck stop or to protect value and desirability of commercial property that is capable of supporting truck stop even if one is not currently operational).

As demonstrated by *Moseley*, whether intended benefits can still be obtained after a restriction's creation is a fact-intensive inquiry. *See id.* at 669. A determination of the intended benefits of the mall parking restrictions may hinge on evidence of the average, lowest, and peak numbers of vehicles or customers that parked at the mall in its heyday compared to today and estimates on the percentage of the total parking area that was used then and now on average and at low and peak times. We can neither determine whether the restrictions substantially secure their intended benefits nor weigh the equities in each party's favor for enforcing the restrictions given this unresolved fact issue.[5] *See Cowling*, 312 S.W.2d at 946.

The unused floor space also creates a fact issue on the benefits available from the parking restrictions. The ROA specified a parking ratio of five spaces per 1,000 square feet of mall floor space. The Foley's location is vast, encompassing 360,000 square feet of floor space. Using the ROA ratio of five spaces per 1,000 square feet of floor space, the Foley's space corresponds to 1,800 parking spaces. Yet the Foley's space has remained padlocked and vacant since 2007.[6] The ROA indicates that the ratio must be kept whether or not portions of the floor space are currently being occupied, but the record does not demonstrate that this requirement still secures today, in a substantial degree, the benefits sought at the time of the ROA when there has been a multi-year vacancy of the mall's largest tenant space, accounting for approximately one-quarter of the mall floor space.

Setting aside the amount of parking necessary with one-fourth of the mall closed, there is also a fact issue of whether the overflow lots are needed to meet the ratio

5. The parties devoted much of their briefing to whether the ROA required the mall to be operated in a first-class manner and, if so, whether the subsequent changes in its condition satisfy the changed condition doctrine. But the question is not whether the mall has changed—it undoubtedly has—but whether those changes impact the benefit provided by and the burdens imposed by the parking restrictions. Even if the quality of the stores or the price point of the goods sold in the mall has changed, that does not necessarily mean that the mall's parking needs have changed. Indeed, based on the limited summary-judg-
ment evidence, we cannot know whether, despite the changes in the mall, parking still occurs on occasion in the overflow parking areas to the benefit of the mall.

6. Although the current owner of this space, CCW, intends to develop it and lease it to many small tenants, the parties do not identify any evidence that it has done so. Rather, as of the filing of the summary-judgment motions, it apparently stood empty and padlocked.

requirements for the remainder of the mall. The record is silent regarding the number of spaces currently available with and without the overflow lots being included in the calculation. But the record does indicate that the Structure Owner defendant that owns the main mall structure (PlazAmericas Texas) shuttered the parking garage under its control, which was capable of holding 1,000 vehicles and now holds none. That may be because the spaces are no longer needed to maintain the required ratio. Or it could be that the closure is a violation of the ROA by one of the parties now seeking to enforce the same restriction on Overflow Owner. The evidence does not clearly indicate either.

Finally, conflicting evidence raises a fact issue regarding whether and how often the overflow parking lots are being used for parking and whether those who park in these outermost lots are parking there to access the mall or for other purposes, such as, for example, ride-sharing to other locations. Overflow Owner points to photographs in evidence showing the lots in a state that it describes as "essentially vacant—wide-open, empty spaces." These photographs show a few cars in the overflow lots, though not necessarily in spots closest to the mall entrances. The record simply does not convey whether these vehicles parked in the area to shop at the mall or for other purposes.

Structure Owners point to deposition testimony from Robert Hammett, a previous owner of the office building located within the mall complex, that "people actually still park in" the overflow lots, particularly to access the office building. But Structure Owners offer no evidence of how often vehicles park in the lots, how many vehicles are parked there on these occasions, whether the primary surface parking lots are full or near-capacity on these occasions, the basis for the statement that the parked vehicles are for individuals who access the office building, whether all five of the overflow parking areas are used, or whether the vehicles would park there if the parking garage were still open. The fact issues concerning the degree to which the restrictions secure a benefit under the ROA prohibit summary judgment.[7]

Aside from the fact issues, we note that the evidence, in its current form, does not strongly support either Overflow Owner's or Structure Owners' positions when the *Simon* factors are applied to evaluate whether changed conditions are extensive enough to warrant lifting of restrictions. See 394 S.W.2d at 254. The first four factors focus on a comparison of the change itself and the surrounding area.

Factor One—the size of the restricted area—does not clearly support either position. Although large, the overflow parking lots are only a portion of the restricted area as a whole, that is, the entire development. And neither party has addressed whether the restrictions should apply to some but not all five of the overflow parking lots.[8]

---

7. Structure Owners also point to testimony by Overflow Owner's corporate representative that "those lots are still capable of being used for parking." The same representative also responded to the question whether "people do park in those lots," with the statement, "They're available for parking, yes." But the issue is not whether the spaces are available for parking; it is whether they provide the parking benefit sought at the time of the ROA.

8. We note from the photographs in evidence that there are well over 500 parking spaces to the south of the mall complex before reaching the overflow lots. The trial court could conclude, if the evidence and jury findings supported it, that some but not all five lots should remain subject to the restrictions.

Factor Two—the location of the restricted area with respect to where the change has occurred—is similarly ambivalent. Depending on how one interprets the facts, the changes at the mall, including the departure of Foley's and the development of a new tenant mix, might be seen as affecting the entire project or only part of it. Evaluation of this factor necessarily requires factual determinations regarding the nature, timing, and impact of the changes based, at least in part, on the amount of parking space utilized by the current tenants and their customers.

Factor Three—the type of change that has taken place—also could be interpreted as favoring either position because multiple changes have occurred over many years, and it is not clear which of the changes at issue were "radical," if any.

Factor Four—the character and conduct of the parties or their predecessors in title—does not clearly favor either Overflow Owner or Structure Owners and, particularly with respect to predecessors in title, is not significantly developed. The mall developer severed the overflow lots from the parcel that contained the main mall structure. Depending on how the facts are interpreted, this could suggest that the development of these lots was to proceed on a separate track from the remainder of the mall complex, or, alternatively, that the severance was only to excise a small parcel to serve as collateral for a loan with no intent to effect ROA enforcement. Regardless, there is competing evidence regarding the past conduct of parties to the ROA generally, including allegations and denials of past violations, acquiescence in violations, and efforts to enforce restrictions. Evidence relevant to this factor requires factual determinations to evaluate whether it favors either side.

Factor Five—the purpose for which the restrictions were imposed, which is the most important factor because it focuses the inquiry for measuring the change—is unhelpful because, as discussed above, it presents a fact issue.

Factor Six—requiring us to consider "to some extent the unexpired term of the restrictions," which is part of the balance of the equities—also does not clearly favor either side. The restrictions still have a significant life expectancy, neither a de minimus period of a few days nor a span of many decades and, thus, may or may not still have significant value to Structure Owners. And neither side has presented evidence regarding future development plans for the mall to enable evaluation of whether the restrictions might have value in the reasonably foreseeable future. The restrictions undoubtedly decrease the value of the overflow lots. Indeed, the evidence suggests that the overflow lots have essentially no current value—except based on their development after the ROA expires.[9] And the record does not establish that the restrictions provide a significant benefit to the current use of the mall, either for their monetary value[10] or for their practical benefit in attracting customers. But even if they do, the restrictions may leave these five parcels undeveloped

---

9. The Restatement provides that whether the servitude property has any continuing value if the restrictions remain in place is not the test. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 7.10 cmt. c. *Cowling,* however, states that the burden on the servitude estate is to be weighed in determining whether to enforce the restriction. 312 S.W.2d at 946.

10. We note that the parties have not presented any evidence comparing the current fair market value of the property owned by Structure Owners with and without the restrictions.

and unused for two more decades.[11] This factor is, at best, neutral. *See Simon*, 394 S.W.2d at 254.

Thus, on this record, none of the *Simon* factors, including the fifth and most important factor, supports either Overflow Owner's or Structure Owners' positions.

Because the removal of a restriction "nullifies it for all · time," *Simon*, 394 S.W.2d at 252, Structure Owners argue that Overflow Owner must show that not only do the restrictions provide no substantial current benefit to the dominant estate but that they will not do so in the future. Seizing on the language in *Cowling* that the servient estate must demonstrate that "it is no longer possible to secure in a substantial degree the benefits sought to be realized through the covenant," 312 S.W.2d at 945, they frame it as an "impossibility test" that requires Overflow Owner to show that "conditions in the future cannot arise creating a greater need for parking than currently exists." *See AC Assocs. v. First Nat'l Bank*, 453 So.2d 1121, 1128 (Fla. Dist. Ct. App. 1984) (examining whether there will be ample parking in "future circumstances" and whether the restrictions could be of benefit during entire remaining term of agreement). In our view, *Cowling* examines the past, present, and reasonably foreseeable and planned future, that is, it examines how long "radical" changes have been in place, the current uses, and any planned uses of the dominant estate that in reasonable likelihood will occur in the reasonably foreseeable future. *Cf. Town of Manchester v. L&J Manchester II, LLC*, No.

HHDCV146052696S, 2016 WL 4530555, at *14, *17–19 (Conn. Super. Ct. July 28, 2016) (examining not only current use of property but party's intention to construct new commercial facilities on property). Here, there is no evidence of any planned future development that will require increased parking in the foreseeable future.

Based on this record, including evidence regarding the length of time the Foley's location has been left empty, the closing of the parking garage, and the conflicting evidence on the actual use of overflow lots for mall access, fact issues exist regarding (1) the ROA parties' purpose in imposing restrictions on the overflow parking lots and (2) whether the restrictions now or in the reasonably foreseeable future will substantially provide the benefits the parties sought to secure by imposing the restrictions. Accordingly, we hold that the trial court erred in granting summary judgment against Overflow Owner · on its "changed conditions" theory.

## C. Summary judgment against Overflow Owner on claim that Structure Owners waived restrictions

Overflow Owner sought a declaratory judgment that the ROA parking restrictions are unenforceable and subject to judicial reformation because Structure Owners waived enforcement through their own disregard of the restrictions. Some but not all Structure Owners moved for summary judgment on the waiver theory.

Sharpstown Texas filed a traditional summary-judgment motion on waiver. Pla-

---

**11.** *Cf.* Restatement: Servitudes § 7.10 cmt. a ("The potentially unlimited duration of servitudes creates substantial risks that, absent mechanisms for nonconsensual modification and termination, obsolete servitudes will interfere with desirable uses of land.... [P]ermitting the enforcement of servitudes after they have lost their utility reduces land values and turns the law into an instrument of extortion. Unless modification or termination is permitted, the servitude beneficiary can exact an unreasonably high price for release of an encumbrance that otherwise has no value and interferes with the ability of the servient owner to use his or her property.").

zAmericas Texas, Burlington, and CCW joined the motion. Mai & Matthew, Smith,[12] and LG Sharpstown did not. The trial court granted the summary-judgment motion and dismissed Overflow Owner's claims for declaratory relief as to all defendants with prejudice. To have granted this relief on a traditional motion for summary judgment, the trial court had to have found that Overflow Owner's waiver argument failed as a matter of law and could not be the basis for relieving Overflow Owner of the ROA parking restrictions and further found that dismissal was proper as to all moving and nonmoving defendants.[13]

### 1. Nonmoving defendants

Mai & Matthews, Smith, and LG Sharpstown did not file motions for summary judgment on Overflow Owner's waiver claim. Nor did they join Sharpstown Texas's motion. The trial court's order dismissing Overflow Owner's waiver-based declaratory-judgment claims against these non-moving defendants was in error. *Mitchell v. Baylor Univ. Med. Ctr.*, 109 S.W.3d 838, 844 (Tex. App.—Dallas 2003, no pet.) (holding that summary judgment for defendant who did not file own motion or join co-defendant's motion was in error and required reversal). Thus, we reverse the trial court's order as to the nonmoving defendants, Mai & Matthews, Smith, and LG Sharpstown.

### 2. Moving defendants

Sharpstown Texas, joined by PlazAmericas Texas, Burlington, and CCW, moved for traditional summary judgment on Overflow Owner's waiver claim. As mov-

ants, the burden was on them to conclusively negate an essential element of the waiver claim or to conclusively establish each element of an affirmative defense. *Sci. Spectrum*, 941 S.W.2d at 911.

Overflow Owner argued that Structure Owners had impliedly waived some or all of their rights under the ROA through five actions or inactions: (1) diminishing the area available for parking by closing the parking garage, (2) closing off access to all or part of the parcels owned by CCW and Burlington, (3) operating their own parcels in a manner "not in accordance with the operation of a first-class regional shopping center," (4) permitting kiosks in locations other than those permitted by the ROA, and (5) declining to designate employee parking areas and to require their employees to park there. As we explain below, at least the first two of these arguments raised fact issues that preclude summary judgment against Overflow Owner on its waiver claim. Thus, we reverse the trial court's order as to the moving defendants as well.

### a. The waiver doctrine

 Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); see *Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 108 (Tex. App.—Houston [14th Dist.] 1995, writ denied). The elements of waiver are (1) an existing right, benefit, or advantage

---

12. Smith takes the position that its pleadings to the trial court were adequate to allow judgment in its favor on the waiver theory. Smith points to its replies to motions, which do not present a basis for judgment as a matter of law on a plaintiff's claim. It also points to its own motion for summary judgment, but that motion fails to seek judgment on the waiver

theory, limiting itself to changed conditions only.

13. Waiver presents an independent basis for potentially concluding that the ROA is no longer enforceable. *See* RESTATEMENT: SERVITUDES § 7.10 cmt. b ("Changed-conditions cases are often closely associated with waiver, but the two doctrines are distinct.").

held by a party, (2) the party's actual knowledge of its existence, and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right. *Tenneco*, 925 S.W.2d at 643.

Waiver can be express or implied. *Id.* Waiver is express when there is "an intentional relinquishment of a known right," and it is implied when there is "intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (quoting *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)).

Implied waiver "is largely a matter of intent, and for … [it] to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Id.* (citing *Motor Vehicle Bd. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999)). In determining if waiver has occurred, courts must examine the acts, words and conduct of the parties, which must unequivocally manifest an intent to no longer assert the right being waived. *Guzman v. Ugly Duckling Car Sales of Tex., L.L.P.*, 63 S.W.3d 522, 528 (Tex. App.—San Antonio 2001, pet. denied).

Restrictive covenants, like other contract provisions, may be waived. *Sharpstown Civic Ass'n, Inc. v. Pickett*, 679 S.W.2d 956, 958 (Tex. 1984). Waiver occurs when a party to a restrictive covenant acquiesces in "substantial violations within the restricted area" such that it waives the right to enforce the restrictions. *Cowling*, 312 S.W.2d at 945; *cf.* RESTATEMENT: SERVITUDES § 7.10 cmt. b ("Waiver arises when a servitude beneficiary has acquiesced in one or more breaches of a servitude obligation."). To be substantial, the violations must be "so great as to lead the mind of the 'average man' to reason-

ably conclude that the restriction in question has been … waived." *New Jerusalem Baptist Church, Inc. v. City of Houston*, 598 S.W.2d 666, 669 (Tex. Civ. App.—Houston [14th Dist.] 1980, no writ). The factors to be considered include the number, nature, and severity of the existing violations; prior acts of enforcement of the restrictions; and whether it is still possible to realize to a substantial degree the benefits intended by the restrictions. *Id.*; *Musgrove v. Westridge St. Partners I, LLC*, No. 02-07-281-CV, 2009 WL 976010, at *3 (Tex. App.—Fort Worth Apr. 9, 2009, pet. denied) (mem. op.); *Hicks v. Loveless*, 714 S.W.2d 30, 35 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). A failure to object to an earlier violation that is insignificant or insubstantial will not support waiver of a new or proposed nonconforming use that is a greater violation. *Sharpstown Civic Ass'n*, 679 S.W.2d at 958.

If the record reflects conflicting evidence on the question of waiver, the resolution of the conflict must be made by the factfinder, precluding summary judgment. *Straus*, 909 S.W.2d at 108.

**b. A fact issue exists with regard to waiver through closure of parking garage and closure of access to all or part of CCW and Burlington parcels**

ROA Section 5.1 prohibits all parties to the agreement from taking any action that "diminish[es]" the area for parking and specifically includes the parking garage in the ROA ratio requirements. The parking garage is owned by PlazAmericas, one of the Structure Owners. It accounts for more than 1,000 parking spaces at the mall. PlazAmericas completely closed the parking garage to the public in 2011, which incontrovertibly diminished the amount of parking area at the mall. The other Structure Owners appear, on

this record, to have acquiesced in the closure. Nonetheless, Structure Owners argue that Overflow Owner cannot take actions on its parcels that would have the same effect—diminishing the amount of parking area at the mall—citing the ROA requirement that parking not be diminished and a nonwaiver clause in the ROA.

The intentional closing of the mall's only parking garage—representing 1,000 parking spaces—by one Structure Owner and the apparent acquiescence in the closure by the other Structure Owners is some evidence that Structure Owners no longer intended to assert the right to maintain the parking ratio established by the ROA restrictions. This is a substantial number of parking spaces. The closure indisputably had some impact on the parking ratio at the mall. Nonetheless, Structure Owners intentionally closed the parking garage or acquiesced in its closure, and it has remained closed for several years.

Structure Owners also have closed or restricted access to the parcels formerly occupied by Foley's and Montgomery Ward, which account for one-fourth of the total floor area of the mall. The possibility of a permanent or semi-permanent closure of a substantial portion of the retail space in the mall is not addressed in the ROA. Nor does the parking ratio requirement address such an event. Yet the closure has obvious relevance to any benefit of enforcing the restrictions, particularly given the large size—one-fourth of the mall's retail space—going unused and without need for parking for customers.

■ The record does not identify the total number of parking spaces still open. A fact issue exists with regard to the degree that the overflow parking areas are necessary to maintain the parking ratio. A fact issue also exists regarding whether, to the extent the ratio has not been maintained, Structure Owners have waived

their right to enforce the ratio by the long-term closure of significant portions of retail space and the parking garage. *See Cowling*, 312 S.W.2d at 945 (noting that court may refuse to enforce restriction when there has been waiver of right to enforce); *New Jerusalem Baptist Church*, 598 S.W.2d at 669 (stating that violation can support waiver finding). These fact issues preclude summary judgment for those Structure Owners that moved for summary judgment on waiver.

Structure Owners separately argue that, regardless of fact issues concerning their conduct limiting the amount of parking available at the mall, there can be no waiver of ROA restrictions as applied to Overflow Owner because the ROA contains a non-waiver clause. We consider that argument next.

### c. The parties' nonwaiver clause does not bar Overflow Owner's waiver claim

■ Structure Owners argue that Overflow Owner's waiver argument fails as a matter of law because the ROA contained a nonwaiver clause precluding any finding of waiver.

■ The purpose of a nonwaiver provision is to prevent claims of waiver and abandonment of contract terms. *See Vance v. Popkowski*, No. 01-15-00897-CV, —— S.W.3d ——, ——, 2017 WL 2290203, at *4 (Tex. App.—Houston [1st Dist.] May 25, 2017, no pet. h.). Nonwaiver provisions have been enforced in the context of restrictive covenants. *See, e.g., A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 676 (Tex. App.—Austin 2003, pet. denied). However, the inclusion of a nonwaiver clause in a restrictive covenant does not conclusively negate the possibility that waiver has occurred. *See Shields LP v. Bradberry*, No. 15-0803, 526 S.W.3d 471, 482–83, 2017 WL 2023602,

at *8 (Tex. May 12, 2017); *Vance*, —— S.W.3d at ——, 2017 WL 2290203, at *4. A nonwaiver clause, itself, can be waived. *Shields*, 526 S.W.3d at 482–83, 2017 WL 2023602, at *8; *Straus*, 909 S.W.2d at 108. Parties may waive nonwaiver clauses through their conduct. *Guzman*, 63 S.W.3d at 528; *see* 13 WILLISTON ON CONTRACTS § 39:36 (4th ed. 2013) (providing that general view is that party to written contract can waive contract provision by conduct despite existence of antiwaiver or failure-to-enforce clause in contract).

▮▮▮▮▮ Waiver through conduct is an "essentially unilateral" action that is based solely on the conduct of the waiving party, not any other party to the contract. *Shields*, 526 S.W.3d at 485, 2017 WL 2023602, at *10. To waive a nonwaiver clause, "there must, at a minimum, be some act inconsistent with its terms." *Id.* at 474, 2017 WL 2023602, at *2. And in no event can waiver be premised on the same conduct the parties specifically agreed would not give rise to a waiver of contract rights. *Id.* at 474, 2017 WL 2023602, at *1. So, for example, a lease agreement with a nonwaiver clause that states acceptance of late rent payments will not act as a waiver is not waived by merely accepting late rent payments; accepting late rent payments is not inconsistent with enforcing a known right under the lease. *See Id.* at 473–74, 485–86, 2017 WL 2023602, 2017 WL 2023602, at *1, *11.

The conduct that the ROA's nonwaiver clause states will not result in waiver is the failure to take affirmative steps to enforce contract requirements:

> No delay or omission by any Party hereto in exercising any right or power *accruing upon the non-compliance or failure of performance by any other Party* under the provisions of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by any Party of any of the covenants, conditions or agreements herein *to be performed by any other Party* shall not be construed to be a waiver of any subsequent breach or of any other covenant, condition or agreement herein contained.

(Emphasis added.) This nonwaiver clause addresses waiver premised on inaction—the failure to demand that another party comply with contractual requirements. As applied to the current controversy, it safeguards each party to the ROA from a finding of waiver based on its own inaction in the face of a violation of the parking restrictions by another party to the ROA. *Cf. Zwick v. Lodewijk Corp.*, 847 S.W.2d 316, 316 (Tex. App.—Texarkana 1993, writ denied) (presenting common scenario in which lessor argues that lease's nonwaiver provision prohibits waiver through repeated acceptance of late rent from lessee who was contractually required to promptly pay rent without demand).

Overflow Owner's waiver argument is not premised solely on inaction by Structure Owners. Overflow Owner does not allege simply that Structure Owners sat on their rights to the point of waiving them. Instead, it argues that some affirmative acts were taken by Structure Owners, including closing the parking garage and closing a large portion of the mall retail space, that violated the ROA restriction on parking ratios and that, by engaging in those affirmative acts, they waived the ability to prevent Overflow Owner from contravening that same restriction. *See Musgrove*, 2009 WL 976010, at *6 (noting that "a restriction can be waived to the extent it is violated, even if a more expansive 'waiver' would not be supported by the evidence"); *cf. Friedman v. Rozzlle*, No. 13-12-00779-CV, 2013 WL 6175318, at *4–5 (Tex. App.—Corpus Christi Nov. 21, 2013, pet. denied) (mem. op.) (holding that

property owner who violated restrictive covenant multiple times over several years waived enforcement of same restriction against third parties as matter of law).[14]

■■ The limited terms of this nonwaiver clause do not address waiver through affirmative breach of the ROA parking restrictions. The clause addresses, instead, whether waiver can be premised on a failure to act in the face of a breach. By its plain terms—addressing waiver through inaction—the nonwaiver clause does not apply to the waiver argument presented here that is based on affirmative breaches: closure of the parking garage and closure of a large portion of the retail facility.[15] *See Concierge Nursing Ctrs., Inc. v. Antex Roofing, Inc.*, 433 S.W.3d 37, 47 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (contract terms given plain and ordinary meaning unless other intent is indicated or ambiguity exists).

### 1) Affirmative act of closing parking garage

Overflow Owner's first assertion of active violation of the ROA's parking ratio restrictions by Structure Owners is the continued closure of access to the mall's parking garage. The parking garage has always been operated by the main mall developer entity, which at times pertinent to this litigation has been Sharpstown Texas and PlazAmericas Texas.[16] Because Overflow Owner's waiver claim against these two entities was premised, at least in part, on the active violation of parking

ratio restrictions by closing off the parking garage that accounted for over 1,000 parking spaces at the mall, the nonwaiver clause does not provide a basis for judgment against Overflow Owner on this claim against these entities. The trial court erred to the extent it held that the nonwaiver clause precludes, as a matter of law, a finding of waiver based on this affirmative act.

### 2) Closing parcels formerly occupied by Foley's and Montgomery Ward

Overflow Owner's second assertion of active violation of the ROA's parking ratio restrictions is the closing of the spaces at the mall that formerly held Foley's and Montgomery Ward. These spaces are now controlled by Burlington and CCW.

Because Overflow Owner's waiver claim against Burlington and CCW was premised, at least in part, on the active violation of parking ratio restrictions by closing off these large portions of the mall's retail space, which accounts for one-fourth of the mall's floor area, the nonwaiver clause does not provide a basis for judgment against Overflow Owner on this claim against these two defendants. The trial court erred to the extent it held that the nonwaiver clause precludes, as a matter of law, a finding of waiver based on this affirmative act.

We conclude that this nonwaiver clause is inapplicable to Overflow Owner's waiver

14. The applicability of a nonwaiver clause was not an issue on appeal in *Friedman v. Rozzlle*. *See* No. 13-12-00779-CV, 2013 WL 6175318, at *3 (Tex. App.—Corpus Christi Nov. 21, 2013, pet. denied) (mem. op.).

15. Courts will not rewrite a nonwaiver clause to broaden its reach beyond that specifically contracted for by the parties. *See Shields LP v. Bradberry*, No. 15-0803, 526 S.W.3d 471, 485–

86, 2017 WL 2023602, at *11 (Tex. May 12, 2017).

16. Sharpstown Texas and PlazAmericas Texas are represented by the same counsel, who explained to the trial court that Sharpstown Texas was the mall developer when suit was filed in 2010 but that "PlazAmerica purchased the mall during the middle of the litigation."

argument, which was premised on waiver through active violation of the ROA. Because the clause is inapplicable to that claim, to the extent the trial court granted summary judgment based on the nonwaiver clause, it did so in error.

·In summary, three of the appellees did not move for summary judgment on waiver grounds. The trial court erred in granting them relief on this claim. The remaining four appellees did move for summary judgment, but fact issues exist that preclude judgment as a matter of law on the waiver claim. Furthermore, the existence of a nonwaiver clause does not provide a basis for judgment as a matter of law in their favor because the clause provides only that inaction does not create waiver.

We sustain Overflow Owner's first issue.

### D. Summary judgment against Overflow Owner on its "alternative claims" for declaratory relief

In its second issue, Overflow Owner argues that the trial court erred in granting summary judgment against it on its three alternative claims for declaratory relief that (1) it is entitled to build a bank or other retail facility on one of the five overflow parking lots; (2) the ROA, if enforceable, is enforceable against all parties; and (3) Structure Owners have waived any limitation on the operation of carnivals in the overflow lots because carnivals have operated at the mall for decades. We first address the standing practice of operating carnivals at the mall.

#### 1. Past carnival operations

■ There is record evidence that Overflow Owner entered into contracts to allow carnivals to operate on its lots over the past couple years. The nonwaiver clause in the ROA states that past failures to enforce restrictions will not waive future enforcement of the restrictions. Thus,

Structure Owners have an argument that they did not waive their right to enforce restrictions that would prevent carnival operations by their alleged past failures to enforce those restrictions. *Cf. Shields*, 526 S.W.3d at 483–85, 2017 WL 2023602, at *9–10 (concluding nonwaiver provision is not waived by engaging in conduct provision expressly stated would not constitute waiver absent any evidence of acts inconsistent with enforcing rights). But there also is record evidence that carnivals have operated intermittently at the mall since the 1970s, well before Overflow Owner obtained any rights to mall premises or any obligations under the ROA. This evidence suggests that one of the Structure Owners authorized carnival companies to operate on the lots during the decades before Overflow Owner's arrival. The evidence is silent on whether all of the most recent carnivals were authorized only by Overflow Owner or possibly, at times, by other premises owners.

On this mixed evidence, Structure Owners' role in permitting recurring carnival operations cannot be described as mere acquiescence or failure to enforce restrictions being violated by others. There is at least some evidence that some or all Structure Owners violated the applicable restriction through their own affirmative conduct in authorizing carnival operations on the premises before Overflow Owner held any ownership interest in the property. *Cf. Friedman*, 2013 WL 6175318, at *4–5 (holding that property owner who violated restrictive covenant multiple times over several years waived enforcement of same restriction against third parties as matter of law). Because one's own violation of a restriction is not conduct covered by the ROA's nonwaiver clause, that clause could not support judgment as a matter of law in favor of Structure Owners who have authorized carnival operations in the past,

and a fact issue exists with regard to which of the Structure Owners actively authorized past carnival operations. Thus, to the extent the trial court found no issue of fact and denied Overflow Owner's "alternative" waiver argument as a matter of law based on the nonwaiver clause, it did so in error.

### 2. Jurisdictional argument that no live controversy exists

■ In its appellate brief, Overflow Owner argues that the trial court granted more relief than was requested when it dismissed its three alternative claims for declaratory relief because none of Structure Owners' dispositive motions sought judgment on the three claims. Apparently conceding that they obtained judgment on claims they had not moved for judgment on, Structure Owners argue that the trial court did not grant more relief than was requested when it dismissed Overflow Owner's alternative claims because those three claims were subject to dismissal on jurisdictional grounds for lack of a live controversy, even without a motion seeking their dismissal.

We note that Structure Owners' broad assertion of no live controversy was not accompanied with briefing specific to each of the three claims. They briefed only one of the claims: whether Overflow Owner may develop a bank or retail facility on an overflow parking lot. They argue that no live controversy exists with regard to the ability to construct on the overflow parking lots because Overflow Owner has not developed any building plans or taken other concrete steps toward construction.

According to Structure Owners, the request for a declaration that Overflow Owner may build on the overflow parking lots sought an advisory opinion and, therefore, was subject to dismissal on jurisdictional grounds even without a motion. We disagree.

■ "The purpose of the Declaratory Judgments Act is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 65 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see* Tex. Civ. Prac. & Rem. Code § 37.002(b). A declaratory judgment is appropriate if a justiciable controversy exists that concerns the rights and status of the parties and is resolvable by the declaration sought. *Tanglewood Homes*, 436 S.W.3d at 65. But there must be "a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute." *Id.* This requirement is met, in the context of a declaratory-judgment action, if "the fact situation manifests the presence of 'ripening seeds of a controversy'" even if the party that seeks a declaration of rights has not incurred damage or injury and the differences between the parties as to their legal rights "have not reached the state of an actual controversy." *Tex. Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153–54 (Tex. App.—Austin 1998, no pet.) (quoting *Ainsworth v. Oil City Brass Works*, 271 S.W.2d 754, 761 (Tex.Civ.App.—Beaumont 1954, no writ)).

■ Structure Owners contend that there is not an actual live controversy for the court to decide regarding Overflow Owner's request to construct a building on one of its five lots. According to Structure Owners, Overflow Owner has not actually attempted to construct a building on the overflow parking lots or taken any concrete steps to do so, such as preparing conceptual drawings, drafting plans, or submitting permit applications. However, concrete steps towards an action whose legality is uncertain are not required to state a controversy in a declaratory-judg-

ment action. *See Moore*, 985 S.W.2d at 153–54. A live controversy exists with regard to Overflow Owner's interest in constructing a building on the overflow lots (manifested by its petition for a declaration of its right to do so) and Structure Owners' opposition.

Structure Owners also argue that the provision allowing construction within the overflow parking area is inapplicable because that provision only permits a "Developer" to build it. But the ROA states that its restrictions run with the land and inure to the benefit and are enforceable by the parties to the ROA *and their successors and assigns*. Overflow Owner is a successor and acquired its rights when it acquired the property.

We sustain Overflow Owner's second issue that the trial court erred in granting Structure Owners summary judgment on Overflow Owner's alternative claim for declaratory relief that it could develop on its overflow lots. This claim meets the ripeness requirements for a declaration of rights. We likewise sustain the issue with regard to the other two alternative claims, which present live controversies involving fact issues that preclude judgment as a matter of law. We remand the alternative claims for declaratory relief to the trial court for its consideration.

### Dismissal of Overflow Owner's Claims for Injunctive Relief

Overflow Owner's trial pleadings sought injunctive relief that (1) compels the other parties to the ROA to operate their property in a manner consistent with a "first class regional shopping center" and (2) precludes the other parties to the ROA from violating the ROA. Structure Owners filed a plea to the jurisdiction and argued for dismissal of Overflow Owner's injunctive claims for lack of standing. They made two standing arguments: first, that Overflow Owner lacked standing to enforce the restrictions because the restrictions were not for its benefit; and second, that Overflow Owner lacked standing because the alleged violations of the ROA by Structure Owners caused no injury to Overflow Owner. The trial court granted Structure Owners' plea and dismissed the claims. In its third and fourth issues, Overflow Owner argues that the trial court erred in granting the plea.

### A. Dismissal for lack of standing

■■■ Structure Owners argued that Overflow Owner lacked standing to enforce provisions of the ROA because the restrictions it sought to enforce were not for the benefit of its property.

■■■ If a party cannot show that a restriction both exists and is intended to inure to its benefit, then that party lacks standing to enforce the restriction. *See, e.g., Country Cmty. Timberlake Vill., L.P. v. HMW Special Util. Dist. of Harris & Montgomery Cntys.*, 438 S.W.3d 661, 667 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see also Davis v. Skipper*, 125 Tex. 364, 83 S.W.2d 318, 322 (1935) (if party seeking enforcement cannot show that restriction to be enforced was imposed to benefit that party's land, "it is construed as a personal covenant merely with the grantor").

Whether and to what extent the ROA's restrictions actually benefit the overflow parking areas is not fully developed in the record before us, but the record does contain at least some evidence that they confer a benefit to provide standing. For example, the ROA expressly provides that one area within the parking area may be developed to contain "bank drive-in facilities ... and ... a bank facility." It is possible the benefit sought to be realized by the ROA's restrictions was to benefit the land where such facilities might be

constructed. It is also at least plausible that the purpose was to benefit the entire development, including the overflow parking areas, into the future, such as by promoting business development of the area and making the parcels more appealing to future purchasers or developers, even after the ROA's expiration. Because we have held that a fact issue exists regarding the benefit sought to be realized by the ROA's restrictions, we hold that a fact issue also exists regarding which, if any, of those restrictions was imposed to benefit the overflow parking areas.

Overflow Owner met its burden to plead facts demonstrating standing. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd). And at least some evidence supports Overflow Owner's assertion that it has standing to enforce at least some of the restrictions. Accordingly, we hold that the trial court erred in dismissing Overflow Owner's claims for injunctive relief to the extent that it did so on the basis that Overflow Owner lacks standing to enforce the ROA. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446; *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004); *Webb v. Voga*, 316 S.W.3d 809, 814 (Tex. App.—Dallas 2010, no pet.). We sustain Overflow Owner's third issue.

### B. Dismissal for lack of any pending claims

In Overflow Owner's fourth issue, it challenges the trial court's determination that it had no pending causes of action for which injunctive relief is an available remedy. We have already held that the trial court erred in granting summary judgment and pleas to the jurisdiction based on standing. Thus, the claims disposed of by those rulings were improperly dismissed and should have been considered for purposes of determining whether Overflow Owner had any live claims for which injunction relief was an available remedy. Those claims included a claim for breach of contract, for which injunctive relief may be an available remedy. We therefore hold that, to the extent that the trial court dismissed the claims for injunctive relief as unsupported by a cause of action, it erred in doing so. We sustain Overflow Owner's fourth issue.

### Remaining Issues Are Moot

Overflow Owner's remaining three issues are mooted by our holdings above. Issue seven challenges the exclusion of evidence attached to or referenced in an expert's affidavit. The content of that affidavit would have no impact on our analysis of the issues decided in this appeal. Thus, the issue is moot.

Issue five challenges the award of attorney's fees. That award was premised on the trial court's resolution of Overflow Owner's requests for declaratory judgments. But we have already held that the trial court erred by dismissing those causes of action. Accordingly, issue five is mooted.

Issue six challenged the entry of a final judgment. We have held that the trial court committed error requiring us to reverse the judgment and remand the case for further proceedings. Accordingly, we hold that issue six, challenging the finality of the trial court's judgment, is mooted by our disposition of the other issues.

### Conclusion

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. All pending motions are denied as moot.