# IN THE SUPREME COURT OF TEXAS

══════════

No. 19-0567

══════════

BPX OPERATING COMPANY, BPX PROPERTIES (NA) LP, SEGUNDO NAVARRO
DRILLING, LTD., FIRST ROCK I, LLC, EF NON-OP, LLC,
AND SOUTH TEXAS SHALE, LLC, PETITIONERS,

v.

MARGARET ANN STRICKHAUSEN, RESPONDENT

══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

══════════════════════════════════════════

**Argued October 28, 2020**

JUSTICE BLACKLOCK delivered the opinion of the Court, in which JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BUSBY joined.

JUSTICE BOYD filed a dissenting opinion, in which CHIEF JUSTICE HECHT, JUSTICE BLAND, and JUSTICE HUDDLE joined.

The petitioners in this case (collectively "BPX") are lessees of Margaret Strickhausen's mineral interest. Strickhausen's lease requires BPX to obtain her "express written consent" before pooling her tract with others. If Strickhausen withholds her express written consent, then "pooling for oil or gas is expressly denied and shall not be allowed under any circumstances." Strickhausen never gave her express written consent, which means BPX may not pool "under any

circumstances." BPX contends Strickhausen nevertheless impliedly ratified an unauthorized pooling agreement by depositing royalty checks calculated on a pooled basis.

As explained below, whether Strickhausen impliedly ratified the pooling depends on whether she exhibited an objective intent to do so. As always, determining objective intent requires an examination of all the relevant circumstances. While the circumstances here include Strickhausen's acceptance of royalties calculated on a pooled basis, they also include many other objective manifestations of her rejection of the pooling and her intention to assert her contractual anti-pooling rights. We agree with the court of appeals that BPX was not entitled to summary judgment on the issue of ratification because the evidence does not "conclusively establish as a matter of law [Strickhausen's objective] 'intention of giving validity to the earlier act' of pooling." 607 S.W.3d 350, 357 (Tex. App.—San Antonio 2019) (quoting *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 506 (Tex. App.—San Antonio 2014, pet. denied). The judgment of the court of appeals is affirmed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

## I.

Strickhausen owns fifty percent of the mineral interest in a tract of land in La Salle County. Delphine Crouch and others (collectively "Crouch") own the other fifty percent. In 2009, Strickhausen and Crouch leased their mineral rights to Escondido Resources II, LLC. After several assignments, BPX acquired the leases.

"The primary legal consequence of pooling is that 'production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit.'" *Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014) (quoting *Se. Pipe Line Co. v. Tichacek*,

997 S.W.2d 166, 170 (Tex. 1999)). "Mineral lessees of multiple tracts may pool some or all of the tracts by combining them into a single unit, *provided pooling is authorized by the leases*." *Id.* (emphasis added).

Although Crouch's lease permits pooling, Strickhausen's lease prohibits pooling without Strickhausen's "express written consent." Her lease states:

> 9. <u>POOLING</u>: Notwithstanding any provision or reference contained in this Lease agreement to the contrary, pooling for oil or gas is expressly denied and shall not be allowed under any circumstances without the express written consent of the Lessor named herein. Further, Lessee is denied the right to seek, or consent to, or participate in the forced pooling of any part of the Leased Premises under the Texas Mineral Interest Pooling Act and any and all amendments thereto or any other pooling or unitization statutes of the State of Texas without Lessor's written consent.

Despite this prohibition,[1] BPX pooled several tracts—including the Strickhausen and Crouch property—to create a 320-acre pooled unit named "White Kitchen Unit No. 4" ("WK4 unit"). Like the Crouch lease, the other leases permit pooling. In April 2012, BPX drilled a well on Strickhausen's tract named "WK Unit 4 No. 1H Well" ("WK4-1H well"), which ran horizontally under the other pooled tracts. The well began producing in August 2012.

On September 20, 2012, BPX sent Strickhausen a letter asking her to sign a ratification of the WK4 unit and a pooling consent agreement. BPX attached to the letter a proposed ratification agreement stating that "the lands covered by the Lease are included in the White Kitchen No.4 Gas Unit as described in the Designation of Pooled Unit dated January 1, 2012." Strickhausen contacted her attorney, Frank Armstrong.

---

[1] Strickhausen's lease also prohibits the commingling of production: "Commingling of production from the Leased Premises, with production from other lands or leases, shall be prohibited prior to such accurate metering, measuring and testing, unless commingling is consented to, in writing, by Lessor and each royalty owner."

Armstrong received BPX's letter on October 8, 2012.  On October 9, he emailed BPX to say he would need more information before he could advise Strickhausen on the request to execute the pooling consent agreement.  In the subsequent email exchange, Armstrong asked when the well was completed, whether and how long it had been producing, and how Strickhausen's royalties would be calculated if she "elects not to sign the Ratification and consent to pooling." On October 11, BPX advised Armstrong that the WK4-1H well began flowing on August 16, 2012.  On October 12, Armstrong informed BPX that "Strickhausen is not refusing to ratify the unit" but that she would like "to understand how a ratification would impact her royalty interest under her Lease."  He then asked how Strickhausen would be paid if she "d[id] not ratify the Unit" and "if she d[id] ratify" the unit.  BPX responded that if Strickhausen refused to ratify the pooling, her royalty would be calculated "based on the length of productive wellbore on the subject tract over the total length of productive wellbore."  BPX asked Armstrong to "[l]et [us] know what Mrs. Strickhausen decides to do."

Also on October 12, Armstrong sent a letter to BPX formally responding to its September 20 letter.  Armstrong's letter pointed out that Strickhausen's lease prohibits pooling without her express written consent.  He further observed: "it appears that the referenced Lease has been pooled, notwithstanding the fact that the express terms of the Lease prohibit pooling." The letter asked BPX to explain "[w]hat authority exists for the pooling" and to provide further information on its drilling operations and on how royalties would be calculated if Strickhausen chose not to consent to pooling.  The parties continued to communicate over the next several weeks.  Armstrong's affidavit states that "[t]hroughout these negotiations until the filing of this

4

suit," he "made it clear" to BPX that Strickhausen "would not ratify the pooling of the White Kitchen No. 4 Gas Unit until a favorable settlement could be reached."

On December 10, 2012, BPX sent Armstrong a letter acknowledging that the lease prohibits pooling without Strickhausen's written consent, admitting that BPX had not obtained her consent, and attempting to answer Armstrong's questions from two months prior. BPX explained that if Strickhausen consented to pooling, it would pay on a "tract participation" basis, with royalties calculated based on the size of her tract relative to the acreage of the entire WK4 unit. If Strickhausen refused pooling, she would be paid royalties based on the length of the "perforated lateral" located on her tract relative to the length of the entire perforated lateral on the WK4 unit. BPX claimed Strickhausen would receive a 25.03% royalty if she agreed to the pooling but only a 23.70% royalty if she did not. BPX concluded the letter by stating that "the royalties will require being placed in suspense" if Strickhausen did not "cooperat[e] by executing the enclosed Ratification of Designation of Pooled Unit." Neither Armstrong nor Strickhausen immediately responded to the letter.

On February 18, 2013, BPX filed a certificate of pooling authority for the WK4 unit with the Railroad Commission. On February 20, BPX sent Strickhausen a $249,901.73 check for royalties for production from August to December 2012. The check stub bore the notation "WK UNIT 4 1H."

On March 8, Armstrong sent BPX a letter rejecting what he described as BPX's March 1, 2013 "offer to settle the issue of the wrongful pooling of the Strickhausen Lease."[2] Armstrong

---

[2] The summary judgment record does not contain the March 1, 2013 offer from BPX to Armstrong.

5

made a counter-offer. He stated that Strickhausen would ratify the wrongful pooling if, among other things, BPX paid her a $300,000 bonus and agreed that she could deposit the $249,901.73 check as "payment of Ms. Strickhausen's royalties from the WK Unit 1H Unit from the date of first sales through December 2012." The counter-offer expired on March 18, 2013. Although BPX did not accept the counter-offer, Strickhausen deposited the check on March 11, 2013. BPX continued to send Strickhausen monthly royalty checks bearing the notation "WK UNIT 4 1H," which she continued to deposit. By July 2014, Strickhausen had deposited $591,497.05 in royalty payments.

On August 1, 2014, Strickhausen sued BPX for breach of contract, among other claims. Although the record contains no written correspondence from March 2013 to August 2014 other than the delivery of royalty checks, Armstrong's affidavit states that "[t]hroughout these negotiations until the filing of this suit," he "made it clear" to BPX that Strickhausen "would not ratify the pooling." Strickhausen continued to deposit the monthly royalty checks, which have totaled more than $700,000.

In 2017, the parties filed motions for summary judgment. Strickhausen argued that because her lease required BPX to pay royalties on all production from any well on her tract, BPX owed her royalties on all production from the WK4-1H well even though the well extended horizontally under other pooled tracts. She also claimed to have suffered damages because BPX denied her the opportunity to negotiate limitations, restrictions, and bonuses for the pooling.

BPX argued that Strickhausen—despite her protests—impliedly ratified the pooling and was estopped from challenging the pooling agreement because she accepted royalty payments calculated on a pooled basis. Strickhausen submitted an affidavit in response, in which she

6

contended that she had always remained opposed to the pooling, that she understood the check stubs' "WK UNIT 4 1H" notations to refer to the well on her land rather than the pooled unit, that she accepted the checks because she believed she was entitled to royalties on all gas produced from the well on her land, and that she accepted the checks not because she intended to ratify the pooling but because she wanted to ensure that she would receive the royalties she believed to be owed.

After the trial court held a hearing on the competing motions, it granted an interlocutory summary judgment for BPX on Strickhausen's wrongful-pooling, commingling, and failure-to-account claims.[3]  The trial court held that Strickhausen "ratified [BPX's] breach by accepting, and negotiating, royalty checks from the pooled units."  It also held that "[e]ven if it was not [Strickhausen's] intention to ratify the pooled units, she is estopped, as a matter of law, from denying that she did so."[4]  The trial court granted Strickhausen's request for a permissive interlocutory appeal on the issues of her ratification of the pooled units and BPX's breach of the lease's no-pooling clause.  *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d).

---

[3] The trial court also granted summary judgment for BPX on Strickhausen's claims that BPX did not obtain her consent to the lease assignments and did not give the required notice of drilling.  The court ruled for Strickhausen on other claims, awarding $20,000 in liquidated damages on one claim and finding a fact issue as to damages on another.

[4] The trial court identified the "controlling question[s] of law" as follows: "Plaintiff's ratification of 1) the pooled units and/or 2) Defendants' breach of the no pooling clause of the lease."  *See* TEX. R. CIV. P. 168.  The trial court did not identify as a controlling question of law for appeal the separate question of estoppel.  As noted above, the trial court held both that Strickhausen ratified the pooling and that she was estopped from denying the ratification.  Under that formulation, ratification is the controlling question one way or another.  Assuming Strickhausen did not ratify the pooling at all, she cannot be estopped from denying the existence of a ratification that never took place.  BPX also asserts in this Court that, completely apart from ratification, Strickhausen is estopped from contesting the pooling because of her acceptance of benefits.  Again, however, the trial court's identification of the "controlling question[s] of law" for the permissive appeal includes ratification but not estoppel.  For that reason, the court of appeals declined to address BPX's separate estoppel arguments, as do we.  *See* 607 S.W.3d at 357–58.

7

The court of appeals accepted the permissive appeal and reversed. *See* 607 S.W.3d at 351. It determined that the evidence of Strickhausen's "ongoing challenge of the pooled unit" created a fact issue as to whether she ratified the pooling agreement. *Id.* at 357. The court of appeals determined that because Strickhausen "challenge[d] the pooled unit, the evidence cannot conclusively establish as a matter of law the lessor's 'intention of giving validity to the earlier act' of pooling." *Id.* (quoting *Bank of Am., N.A.*, 510 S.W.3d at 506). BPX petitioned for review. It argues that Strickhausen impliedly ratified the wrongful pooling.

## II.

"We review summary judgments de novo." *Tex. Workforce Comm'n v. Wichita County*, 548 S.W.3d 489, 492 (Tex. 2018). In doing so, "we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) (quoting *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)). "Summary judgment is proper when no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Wichita County*, 548 S.W.3d at 492. "When the parties file competing summary judgment motions and the trial court grants one and denies the other, 'we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered.'" *Id.* (quoting *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015)). In a permissive appeal where the trial court has identified issues for appeal, "[w]e accept the trial court's conclusions on those issues [not appealed] for purposes of this interlocutory appeal, but we express no opinion on those conclusions." *Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 129 n.3 (Tex. 2018).

8

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *Wise v. Pena*, 552 S.W.2d 196, 199 (Tex. App.—Corpus Christi–Edinburg 1977, writ dism'd). It "is but an agreement, express or implied, by one to be bound by the act of another performed for him." *Dillingham v. Anthony*, 11 S.W. 139, 142 (Tex. 1889). "Ratification extends to the entire transaction." *Land Title Co. of Dall., Inc. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980). In other words, a party cannot "ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *Id.* Ratification may occur "by express act or word," or it "may be inferred from a party's course of conduct." *Motel Enters., Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex. App.—Houston [1st Dist.] 1990, no writ).

Ratification is often treated as a mixed question of law and fact. *See Briggs v. Briggs*, 337 S.W.2d 753, 756 (Tex. App.—Amarillo 1960), *rev'd on other grounds*, 346 S.W.2d 106 (Tex. 1961). When the facts are uncontroverted, however, the court may decide the question of ratification as a matter of law. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 66 (Tex. 2015); *see also Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 166 (Tex. App.—Tyler 2011, no pet.) ("Whether a party has ratified a contract may be determined as a matter of law if the evidence is not controverted or is incontrovertible."); *Country Hollow Joint Venture v. Enter. Cap. Co., N.V.*, No. 92-5570, 1992 WL 352653, at *5 (5th Cir. Nov. 23, 1992) (same; applying Texas law).

Whether two parties have formed a contract is, of course, a question of the parties' intent. *See City of Houston v. Williams*, 353 S.W.3d 128, 143 (Tex. 2011) ("In order to qualify as a

9

contract, the document or documents must evidence the parties' intent to be bound."). Likewise, whether one party has ratified changes to a contract is also a matter of intent. *See Smith v. Estill*, 28 S.W. 801, 805 (Tex. 1894) ("To constitute a ratification, it must appear that the acts relied upon were done with a full knowledge of all the facts, and with intent to adopt the unauthorized act in question."); *Jamail v. Thomas*, 481 S.W.2d 485, 490 (Tex. App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.) ("By the term ratified . . . is meant the approval by act, word, or conduct, with full knowledge of the facts, of the prior act, with the intention of giving validity to such prior act.") (cleaned up); *Humble Oil & Refin. Co. v. Jeffrey*, 38 S.W.2d 374, 377 (Tex. App.—Austin 1931), *aff'd*, 55 S.W.2d 521 (Tex. Comm'n App. 1932, judgm't adopted) ("It is settled law that ratification involves the intention to ratify.").

Express ratification—in writing, for example—typically makes the parties' intentions clear. When implied ratification is alleged, determining the parties' intentions can become more complicated. A party's subjective state of mind is immaterial to a claim of implied ratification. *See Rogers v. Wolfson*, 763 S.W.2d 922, 924 (Tex. App.—Dallas 1989, writ denied) ("Mental intent or reservation . . . does not affect determination of the question of ratification."). Courts instead look to objective evidence of intent, such as the party's conduct. *See Mo. Pac. R.R. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex. App.—Austin 2002, pet. dism'd) ("Ratification may be inferred by a party's course of conduct and need not be shown by express word or deed."). As with most objective inquiries, determining a party's objective intent requires an examination of "the totality of the circumstances." *State v. One (1) 2004 Lincoln Navigator*, 494 S.W.3d 690, 706

10

(Tex. 2016) (Devine, J., concurring).[5] "A manifestation [of intent] does not occur in a vacuum, and the meaning that may reasonably be inferred from it will reflect the context in which the manifestation is made." RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. e (2006).[6]

When analyzing a claim of implied ratification, we are mindful that "[t]he liberty to make contracts includes the corresponding right to refuse to accept a contract or to assume such liability as may be proposed." *St. Louis Sw. Ry. Co. of Tex. v. Griffin*, 171 S.W. 703, 704 (Tex. 1914). To avoid undue interference with a party's right to reject contract terms to which he does not agree, many Texas courts have held that implied ratification should be found only if the party's actions "*clearly* evidenc[e] an intention to ratify." *Chrisman v. Electrastart of Hous., Inc.*, No. 14-02-00516-CV, 2003 WL 22996909, at *5 (Tex. App.—Houston [14th Dist.] Dec. 23, 2003, no pet.) (emphasis added).[7] We agree that parties seeking to establish implied ratification or ratification by conduct must point to words or actions that "clearly evidenc[e] an intention to ratify." *Id.*

---

[5] *See also Nobani*, 784 S.W.2d at 547 (intent "may be inferred from the existing facts and circumstances, as where a party retains the benefits of an invalid contract with full knowledge of the facts that make the contract voidable"); *Landrum v. Devenport*, 616 S.W.2d 359, 363 (Tex. App.—Texarkana 1981, no writ) (viewing "the surrounding circumstances of the transaction" when evaluating intent to ratify); *Sawyer v. Pierce*, 580 S.W.2d 117, 123 (Tex. App.—Corpus Christi–Edinburg 1979, writ ref'd n.r.e.) (recognizing ratification may consist of multiple "acts" viewed in context).

[6] BPX contends the court of appeals blurred the line between objective and subjective intent by considering Strickhausen's subjective mental reservations. BPX is correct that Strickhausen's actual state of mind is not the focus of the objective inquiry. Strickhausen's ratification arguments are not primarily premised on a claim of subjective mental reservation, however. The record contains abundant examples of Strickhausen's words and actions—known to BPX—that provide objective evidence of her intent.

[7] *See also Howard v. Sunset Life Ins. Co. of Am.*, No. 03-01-00407-CV, 2002 WL 24053, at *5 (Tex. App.—Austin Jan. 10, 2002, no pet.) (same); *Lesikar v. Rappeport*, 33 S.W.3d 282, 300 (Tex. App.—Texarkana 2000, pet. denied) (same); *Facciolla v. Linbeck Constr. Corp.*, 968 S.W.2d 435, 440 (Tex. App.—Texarkana 1998, no pet.) (same); *Daugherty v. McDonald*, 407 S.W.2d 954, 958 (Tex. App.—Fort Worth 1966, no writ) (same); 2A C.J.S. *Agency* § 63 (March 2021 Update) ("The intent to ratify must be clear and absolute, and no intent will be inferred when the alleged ratification can be explained otherwise.").

A clear-showing requirement for implied ratification is consistent with the well-established standard for proving waiver by conduct. Ratification and waiver have been called "opposite sides of the same coin." *Caldwell v. Callender Lake Prop. Owners Improvement Ass'n*, 888 S.W.2d 903, 910 (Tex. App.—Texarkana 1994, writ denied). Both can arise by implication from a party's actions, and both involve ascribing unspoken intent to a party and thereby altering his legal rights. It is well-settled that "[w]hile waiver may sometimes be established by conduct, that conduct must be *unequivocally inconsistent* with claiming a known right." *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005) (emphasis added). If implied waiver by conduct must be established "unequivocally," it stands to reason that implied ratification by conduct should be subject to a similar requirement. Thus, as the party asserting implied ratification, BPX must show that Strickhausen's behavior clearly evidenced an intent to ratify the unauthorized pooling.

**A.**

BPX advances a categorical rule under which a lessor's acceptance of royalties calculated on a pooled basis always amounts to ratification of pooling as a matter of law. The authorities on which BPX relies, however, do not support such a bright-line rule. In *Hooks v. Samson Lone Star, Limited Partnership*, 457 S.W.3d 52 (Tex. 2015), this Court addressed implied ratification in a similar factual context. Hooks' leases authorized Samson to pool, which Samson did. *Id.* at 65. Because a nearby owner refused to pool, Samson notified Hooks it would amend the unit's boundaries. *Id.* Hooks did not challenge the amended unit but nevertheless claimed Samson lacked authority to "unpool" the original unit. *Id.* He sued seeking royalties from both the original unit and the second unit. *Id.* at 65–66. We held that Hooks ratified the amended unit. "[B]ecause of the undisputed contents of the notice letter [describing the amended unit], Hooks' acceptance

12

of royalties for the new unit, and Hooks' refusal to challenge the new unit," we concluded that Hooks ratified the amendment as a matter of law. *Id.* at 66.

The holding in *Hooks* rested on the confluence of several facts all pointing in the direction of ratification, including "Hooks' refusal to challenge the new unit." *Id.* In reaching that conclusion, *Hooks* cited *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013, no pet.), which states that "[a]ny act inconsistent with an intent to avoid a contract has the effect of ratifying the contract." *See Hooks*, 457 S.W.3d at 66. Although BPX makes much of the "any act inconsistent" formulation, *Hooks* does not stand for the proposition that *any* inconsistent act supports ratification as a matter of law without an examination of other objective evidence of the party's intent. Our reasoning in *Hooks* itself did not rely on a single act. Instead, we found ratification only after considering all the relevant facts and circumstances together: "Because of the undisputed contents of the notice letter, Hooks' acceptance of royalties for the new unit, and Hooks' refusal to challenge the new unit, we decide the question of ratification as a matter of law." *Id.* Crucially, among those facts was Hooks' "refusal to challenge the new unit." *Id.*

Two years later, we applied *Hooks* to claims by other lessors in the same amended unit. *See Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 784–85 (Tex. 2017). Several other lessors in the pool asserted that, unlike Hooks, they did not receive a letter notifying them of an amended unit. *Id.* at 785. We rejected that argument, holding that the lessors received sufficient notice when they joined a suit against Samson which described the amendment. *Id.* at 785–86. Because the lessors continued to accept payments without challenging the amended unit after

13

receiving notice of the amendment, we determined that they ratified the amendment. *Id.* As in *Hooks*, our conclusion rested in part on the lack of a challenge to the amended unit.

In the earlier case of *Montgomery v. Rittersbacher*, 424 S.W.2d 210 (Tex. 1968), this Court explained that a royalty owner can ratify an unauthorized pooling agreement "either by joining in the execution of the agreement or by accepting royalties from the pool." *Id.* at 215. Although we noted the possibility of ratification by acceptance of "royalties from the pool," we did not address whether Montgomery ratified by accepting benefits, and we did not address the effect of a contemporaneous challenge to pooling on a claim of implied ratification. Instead, we concluded that Montgomery ratified the pooled unit because he had previously sued to enforce it. *Id.* Far from indicating that lessors can impliedly ratify pooling despite suing to *challenge* it, *Montgomery* stands for the unremarkable proposition that lessors who sue to *enforce* a pooling agreement cannot later claim not to be bound by it.[8]

In none of these cases did we hold that ratification occurs *as a matter of law* whenever a party commits "[*a*]*ny act* inconsistent with an intent to avoid a contract." *Hooks*, 457 S.W.3d at

---

[8] BPX relies as well on *Yelderman v. McCarthy*, 474 S.W.2d 781 (Tex. App.—Houston [1st Dist.] 1971, writ ref'd n r.e.). In that case, Yelderman's lease authorized only limited pooling. *Id.* at 782. Yelderman complained that McCarthy exceeded his pooling authority. *Id.* The court of appeals held that Yelderman consented to make McCarthy his agent with respect to pooling and that Yelderman ratified the pooling by accepting checks expressly tendered as full payment of the disputed claim. *Id.* at 784. It found Yelderman's contention that he considered the payments only "partial payment" insufficient to avoid ratification. *Id.* The court further held that "[a] creditor who accepts and cashes a check tendered as full payment of a disputed claim cannot vary the legal effect of such acceptance as an accord and satisfaction by protesting that he is accepting the check as part payment only." *Id.*

*Yelderman* is distinguishable in several respects. To begin with, Yelderman's lease authorized pooling. *Id.* at 782. Yelderman agreed McCarthy could pool his interest and then complained about the way it was done. *Id.* Here, by contrast, BPX had no authority whatsoever to pool Strickhausen's interest. Unlike Yelderman, Strickhausen did not agree to make the lessee her agent with respect to pooling. Instead, she bargained for the right to prohibit all pooling without her express written consent, which she never gave. And Strickhausen did much more to defeat ratification than indicate she was accepting the checks as "partial payment." She asserted her rights in writing multiple times, and her attorney was engaged in settlement negotiations with BPX throughout the disputed period.

14

66 (quoting *Bob Montgomery Chevrolet*, 409 S.W.3d at 195) (emphasis added). If that were the standard, as BPX suggests, then intent would no longer be the controlling inquiry. Ratification would become a trap for the unwary, in which "any act" that can successfully be portrayed as inconsistent with rejecting the amended agreement would establish ratification as a matter of law despite abundant countervailing evidence. If ratification is to remain tethered to intent, as it must, we should be hesitant to adopt so categorical an approach.

Nor do our prior decisions support a bright-line rule under which acceptance of royalties calculated on a pooled basis always constitutes ratification of pooling regardless of contrary manifestations of intent. There may be good policy justifications for such a rule in the oil and gas context, and the legislature is of course free to create one. But as a matter of contract formation, we are not eager to adopt strict-liability rules that could impute an intent to be contractually bound onto a party who never truly demonstrated any such intention. Acceptance of benefits is a quintessential indicator of ratification, and it will support a finding of ratification as a matter of law in many cases. But as with any objective inquiry, adjudicating a claim of implied ratification "requires an examination of the totality of the circumstances," not a narrow focus on one fact to the exclusion of all others. *One (1) 2004 Lincoln Navigator*, 494 S.W.3d at 706 (Devine, J., concurring); *see also Nobani*, 784 S.W.2d at 547; *Landrum*, 616 S.W.2d at 363; *Sawyer*, 580 S.W.2d at 123.[9]

---

[9] This is consistent with our recognition in *Kramer v. Kastleman*, 508 S.W.3d 211, 213 (Tex. 2017), that determining whether a litigant who voluntarily accepts the benefits of a judgment is precluded from challenging the judgment "is a fact-dependent, estoppel-based doctrine focused on preventing unfair prejudice to the opposing party." In the divorce context involving the division of shared interests, for example, "merely using, holding, controlling, or securing possession of community property awarded in a divorce decree does not constitute clear intent to acquiesce in the judgment" absent a showing of prejudice. *Id.* at 228; *see also In re Johnson*, ___ S.W.3d ___, ___

15

**B.**

We turn now to whether Strickhausen's actions clearly evidence an intent to ratify BPX's unauthorized pooling. We think not, and certainly not to the extent required to establish ratification as a matter of law for summary judgment.

We begin with the lease itself. Strickhausen—unlike her neighboring lessors—bargained for a lease that strictly prohibits pooling "under any circumstances" without her "express written consent." As explained in more detail below, all her subsequent actions should be examined in light of both parties' knowledge of this element of their agreement. A party armed with a lease prohibiting pooling without *express*, *written* consent should have less reason to worry about mistakenly giving her *implied*, *unwritten* consent than does a party not protected by such a clause.

Turning to the history of the dispute, as soon as Strickhausen learned BPX had pooled her interest despite the contractual prohibition, her attorney sent BPX a letter asserting Strickhausen's anti-pooling rights and asking for an explanation. BPX responded by acknowledging that the lease prohibits pooling without Strickhausen's written consent and by asking her to ratify the pooling in writing. BPX's letter threatened to put her royalties "in suspense" if she did not ratify. Although she did not sign the proposed ratification, BPX did not put the royalties in suspense or calculate Strickhausen's royalties without the pooling. Instead, BPX began sending unsolicited royalty checks calculated based on the unauthorized pooling. BPX then offered to settle Strickhausen's wrongful-pooling claim. In response, Strickhausen's attorney rejected the offer, again asserted Strickhausen's anti-pooling rights, and offered to settle the dispute for $300,000 and other

(Tex. 2021) (discussing various exceptions to the general rule that one cannot accept benefits under a will while contesting its validity).

16

consideration. BPX continued to send royalty checks. Believing she was entitled to significant royalties with or without pooling, Strickhausen deposited the checks. Her attorney continued to attempt to negotiate a settlement of her wrongful-pooling claim, although the extent of those efforts is unclear. When that failed, Strickhausen sued BPX for breach of the lease's anti-pooling clause.

Considered together, these actions do not amount to clear evidence of an intent to ratify sufficient to support a judgment of ratification as a matter of law. To be sure, acceptance of the benefits of pooling *can* amount to ratification, depending on the circumstances. *See, e.g.*, *Yelderman*, 474 S.W.2d at 784; *Leopard v. Stanolind Oil & Gas Co.*, 220 S.W.2d 259, 264 (Tex. App.—Dallas 1949, writ ref'd n.r.e.) (holding lessor who was entitled to no royalties in the absence of pooling ratified unitization by accepting royalty checks based on production from the pool). But when the facts bearing on objective intent point in different directions, nothing in Texas law requires us to elevate the *implied* intent evidenced by acceptance of the checks over the *express* intent evidenced by all Strickhausen's other actions. Actions that evidence an intent to ratify— such as depositing the checks—may in some cases be enough to overcome express indications of an objective intent not to ratify, but only if the facts and circumstances as a whole "*clearly evidenc*[*e*] an intention to ratify." *Chrisman*, 2003 WL 22996909, at *5 (emphasis added). The facts here do not meet that standard.

Depositing pooled royalty checks despite claiming to object to the pooling can amount to ratification as a matter of law in some cases. *See Yelderman*, 474 S.W.2d at 784 ("A creditor who accepts and cashes a check tendered as full payment of a disputed claim cannot vary the legal effect of such acceptance as an accord and satisfaction by protesting that he is accepting the check as part payment only."). On the other hand, "[c]onduct that can be otherwise explained may not

17

effect ratification." RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. d; *see also Landrum*, 616 S.W.2d at 363 ("Intention to ratify or waive cannot be inferred from acts where . . . the party had no satisfactory alternative.").

In Strickhausen's case, the inference of consent to pooling from her acceptance of benefits is unusually weak. This is not a situation in which the only reason Strickhausen was owed money is because of the pooling. In such an instance, courts often refuse to allow parties to accept the benefits of a deal without being bound by it. *See, e.g.*, *F. M. Stigler*, 609 S.W.2d at 757–58 (determining Stigler ratified its agent's unauthorized subordination of a lien by retaining down-payment funds it would not have received but for a chain of events resulting from the subordination). Strickhausen, however, has a reasonable explanation for her acceptance of the checks that does not imply her acceptance of the pooling. She knew BPX owed her significant royalties regardless of whether she agreed to the pooling. BPX continued to send royalty checks despite the parties' mutual acknowledgment that Strickhausen had not consented to the unauthorized pooling and despite BPX's knowledge that Strickhausen believed BPX owed her significant royalties with or without the pooling. Under these circumstances, her acceptance of the checks does not necessarily point towards ratification at all. She could reasonably have viewed the checks as payment towards what she believed she was owed without pooling.[10] BPX, for its part, knew Strickhausen objected to the pooling and had every reason to expect she would view

---

[10] We assume for the sake of argument that Strickhausen knew the "WK UNIT 4 1H" notation on the checks indicated that the royalties had been calculated on a pooled basis. She denies this. While BPX refers to the pooled unit as the "White Kitchen Unit No. 4," it refers to the well on Strickhausen's property as "WK Unit 4 No. 1H Well." The notation on the check stubs thus corresponds to the particular well on Strickhausen's land, which makes it plausible that she interpreted the notation to mean the check represented proceeds from her well, not from her share of the pooled unit. We do not resolve this factual dispute.

18

the checks as payment toward what she believed to be her "true" royalty. It sent her the checks anyway.[11]

Again, we do not cast doubt on the well-established rule that ratification can arise from acceptance of benefits or from other intentional acts despite a party's protestations to the contrary. *See, e.g.*, 2A C.J.S. *Agency* § 71 ("[A] ratification may occur notwithstanding the principal's protestations or expressions of disapproval . . . where the principal continues to retain the benefits which he or she obtained as a result of such act."). But ratification is not a game of "gotcha." The law does not *require* courts to disregard clear, written expressions of intent not to ratify any time a party accepts benefits or commits some other act consistent with ratification. Instead, a court *can* disregard a written or verbal expression of intent if, all things considered, it is belied by the party's other actions. That is not the case here, where Strickhausen bargained to avoid pooling without her express written consent, made her contemporaneous objection to pooling abundantly clear, and has a reasonable explanation for her acceptance of royalties that is consistent with her objections to the pooling.

Another relevant consideration is that BPX could hardly have been under a misimpression about Strickhausen's intentions. "The modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480

---

[11] BPX contends that "[a] party like Strickhausen who believes an agreement is invalid but receives payment under the agreement needs to make an election—accept the payment and ratify the agreement or refuse the payment and challenge the deal." In other words, BPX acknowledges that Strickhausen was owed royalties, but it argues she had no right to *these* royalties unless she accepted the pooling. "Money is inherently fungible," however. *Lopez v. Lopez*, 283 S.W.3d 353, 357 (Tex. App.—Waco 2008, no pet.) (Gray, C.J., dissenting). BPX's unilateral decision to calculate the amount of Strickhausen's checks based on pooling in violation of the lease does not change the fact that BPX owed her a significant sum under the terms of the lease one way or another.

19

S.W.2d 607, 609 (Tex. 1972) (quoting 1 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 22A (3d ed. 1957)). The "reasonable person" from whose perspective the meaning of a contracting party's acts and words must be judged is the counterparty, in this case BPX. *See id.* at 609–10 ("And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such." (quoting 1 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 22A)); RESTATEMENT (SECOND) OF CONTRACTS § 19 cmt. c (1981) ("[E]ven though the intentional conduct of a party creates an appearance of assent on his part, he is not responsible for that appearance unless he knows or has reason to know that his conduct may cause the other party to understand that he assents.").

Under the circumstances, BPX could not have reasonably inferred that Strickhausen's acceptance of the checks meant she consented to pooling. Strickhausen consistently asserted her right to reject pooling, and BPX consistently acknowledged that right. BPX knew she objected, it knew she had the contractual right to refuse pooling until she gave her written consent, it knew her lawyer was negotiating for a settlement of her wrongful-pooling claim, and it knew she was entitled to be paid a substantial royalty whether or not she ratified the pooling. Considering all these facts together, Strickhausen's acceptance of checks containing a notation corresponding to a pooled unit gave BPX little reason to believe she consented to the pooling.

Finally, the terms of Strickhausen's lease, which prohibits pooling without her express written consent, cannot be ignored when determining her objective intent. As the dissent observes, in some instances, the law recognizes that "[a]ctions may speak louder than words." RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. e. On a question of contractual intent, however, words matter a great deal—especially words in a written agreement that disavows implied,

unwritten agreements. Strickhausen's lease says: "Notwithstanding any provision or reference contained in this Lease agreement to the contrary, pooling for oil or gas is expressly denied and shall not be allowed under any circumstances without the express written consent of the Lessor named herein." Strickhausen knew all along—including when she deposited the royalty checks—that she had bargained for a strong prohibition on pooling without her written consent. BPX knew it as well.[12] BPX's predecessor did not have to agree to this term, and BPX did not have to take over a lease containing it. But they did, and the parties' subsequent actions must be examined with this clause in mind.

This is not simply a case where the parties' agreement generically prohibits pooling but the lessor later knowingly accepted the benefits of pooling and thereby ratified the pooling. Strickhausen's lease does not just prohibit pooling. It takes the additional step of dictating the *only* circumstance under which pooling can *ever* be authorized: with Strickhausen's "express written consent." Without her "express written consent," the lease prohibits pooling "under any circumstances." Of course, "any circumstances" includes circumstances that might otherwise amount to ratification of the pooling. The self-evident purpose of the "no-pooling-without-my-written-consent" clause is to ensure that neither Strickhausen's conduct nor her spoken words are taken as consent to pooling.[13] In other words, the clause exists precisely to stave off arguments like implied ratification.

---

[12] *See* Original Drilling Title Opinion – White Kitchen Prospect – Hoelscher Heirs/Strickhausen Leases (June 25, 2012) (Informing BPX that under the lease "pooling for oil and gas is expressly denied and shall not be allowed under any circumstances without the express written consent of the Lessor. In this regard, *you should obtain a ratification of the Designation of Pooled Unit*[.]") (emphasis added).

[13] *Cf. EWB-I, LLC v. PlazAmericas Mall Tex., LLC*, 527 S.W.3d 447, 467–68 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("The purpose of a nonwaiver provision is to prevent claims of waiver and abandonment of

We do not suggest that Strickhausen could *never* waive her anti-pooling rights by her conduct. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 483–84 (Tex. 2017) (observing that any contract provision can be waived, including an anti-waiver clause). Strickhausen's objective intent, however, must be examined in light of both parties' knowledge that she was protected by the "no-pooling-without-my-written-consent" clause against accidentally or impliedly consenting to pooling.

In sum, we cannot conclude that the totality of Strickhausen's words and actions—considered objectively—provide the clear evidence required to support a finding of implied ratification as a matter of law. Strickhausen bargained for a strong anti-pooling clause, she consistently withheld the written consent the clause requires, and she reiterated her objections multiple times. Although she accepted BPX's money, she reasonably believed that one way or another she was owed an amount in the same ballpark as the checks she deposited. BPX did not establish implied ratification as a matter of law, and summary judgment for BPX on this issue was improper.

## IV.

The judgment of the court of appeals is affirmed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

---

contract terms. . . . And in no event can waiver be premised on the same conduct the parties specifically agreed would not give rise to a waiver of contract[ual] rights.").

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** June 11, 2021